FILED

## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
2018 SEP 27  AM 8: 52

### Case No. 6:18-CV- 1606- ORL- 31- GJK

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      v.

RONALD C. MONTANO, TRAVIS
STEPHENSON, ANTONIO GIACCA and
MICHAEL WRIGHT,

      Defendants.

## COMPLAINT FOR INJUNCTIVE RELIEF AND OTHER REMEDIES AND DEMAND FOR JURY TRIAL

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## SUMMARY OF THE ACTION

1.      This case concerns U.S.-based marketers who engaged in a massive fraud involving the offer and sale of securities called "binary options" through false, misleading and otherwise deceptive videos, websites, and other forms of marketing promoted on the Internet and disseminated via spam email to millions of prospective investors in the U.S. and globally.

2.      Beginning in at least September 2013 through at least December 2016 ("Relevant Period"), Defendant Ronald Montano launched or participated in at least thirty-five (35) marketing campaigns that fraudulently solicited and induced investors to open and

fund unregistered, off-exchange binary options trading accounts. (A binary option is a financial instrument with a payoff value tied to the price of another financial asset, such as a share of stock, but which gives the holder no right to purchase or sell such asset.) Between about January 2014 and April 2016, Defendant Travis Stephenson partnered with Montano in at least three (3) of Montano's binary options campaigns. Between at least August 2013 and August 2017, Defendant Antonio Giacca launched or participated in at least thirty (30) similar fraudulent campaigns, often partnering with another individual to share in the profits, and including at least one campaign in aid of a fraudulent campaign by Montano.

3.      During the Relevant Period, Defendant Michael Wright willfully aided and abetted Montano's fraud by creating deceptive emails, scripts, slides, and/or videos for Montano to use in fraudulent binary options campaigns. Wright also willfully aided and abetted the fraud of other marketers in binary options by creating similar materials for them.

4.      In offering binary options to investors through fraudulent marketing campaigns, Defendants Montano, Stephenson, and Giacca (collectively, the "Marketing Defendants") acted as so-called "affiliate marketers," who typically sell a third party's goods or services, often over the Internet, and receive a commission for each sale. As affiliate marketers, they deceptively promoted the purchase of unregistered binary options securities from unregistered brokers.

5.      The Marketing Defendants' campaigns included professional videos that touted a free software trading program running on autopilot and was supposedly capable of generating large profits for investors who opened accounts on the instructions that followed the videos. The videos purported to show actual investors and real results, including people

2

enjoying rich lifestyles achieved through binary options trading, and "live" demonstrations of people funding accounts in "real time" and seeing their trading balances increase automatically. The participants in the videos insisted to viewers that these were real events.

6.     Yet what was depicted was entirely fiction. Paid actors pretended to be recent millionaires; fake testimonials claimed falsely that there was great wealth made by investing in binary options and using the free trading software; and fabricated photos showed only phony account statements. The "live" demonstrations of profitable trading were shams.

7.     Samples of the Defendants' videos may be viewed here: https://www.sec.gov/video-exhibits-SEC-v-Montano. The videos are incorporated into this Complaint by reference as examples of the Defendants' fraudulent materials.

8.     The Marketing Defendants also created websites for each marketing campaign. The websites featured videos or visual materials from the videos and operated as platforms for email recipients and video viewers to be further misled by the Defendants' schemes. The websites funneled investors to "recommended" brokers for funding binary options trading accounts and often misled viewers to continue believing, as featured in videos, that trading and profit-making would start automatically with their initial deposits.

9.     The Marketing Defendants received a flat commission from a broker, customarily in the range of $350 to $450, and sometimes more, for every customer who viewed their materials and then opened and funded a binary options account for trading. Wright received substantial payments from Montano for creating fraudulent materials for Montano's use, as well as payments from other marketers for preparing similar materials.

3

10.     The Marketing Defendants were part of an informal group of binary options marketers who often coordinated their activities. Marketers in the group announced their upcoming campaigns and agreed to disseminate each other's materials through their own email lists, thus vastly expanding the universe of possible investors to be defrauded. The Marketing Defendants paid fellow marketers a commission each time their fellow marketers sent a Marketing Defendant's campaign materials to those who opened and funded accounts.

11.     The Marketing Defendants also each participated for a commission in the binary options campaigns of their fellow marketers, earning substantial sums of additional money based on fraudulent offering materials. The Marketing Defendants disseminated the campaign materials of their fellow marketers to their own email lists and received a flat commission from fellow marketers for every recipient of those emails who then opened and funded accounts for trading. The Marketing Defendants disseminated their fellow marketers' campaigns knowing that these third-party materials were materially false and misleading.

12.     Giacca, for example, coordinated his activities with other marketers via an invitation-only Skype chat, where many of the marketers gathered to plan and promote their fraudulent campaigns to other marketers. In chats, marketers often ridiculed investors who traded binary options based on their materials. In one example, in May 2014, Timothy Atkinson, a fellow marketer, wrote of raising "charity" for those who lost money investing. Atkinson asked Giacca if he had started a charity "for all the fallen customers of your last offer? Customers Come First Fund?" Giacca replied, "[D]oing a fund raiser for them, to put them back on track, so we can scam them again." Atkinson wrote, "LOL exactly!" Giacca

4

replied, "[T]he whole idea is to show them that there is hope, then take it all away one more time lol." Atkinson answered, "[J]ust ONE more time hahahaha . . . love the slogan son!"

13.     Wright too was conscious of his participation in a scam on prospective investors. He continued to prepare false marketing materials for binary options affiliate marketers because "the money was real good" for him. In April 2015, he privately told another individual involved in creating materials for Montano's binary options campaigns that, "in the back of my mind I'm thinking, 'You spoiled f[***]ing piece of scam sh[**]!' But I'm a willing participant and I like their money."

14.     Over the Relevant Period, at least 1.5 million prospective investors viewed fraudulent marketing websites and sales videos that Montano and/or Wright created and Montano disseminated (sometimes in partnership with Stephenson) to advise individuals to open an account with purported "recommended" brokers and use the marketed trading software. In response to these campaigns, at least 10,000 investors deposited over $2.5 million to initially fund binary options trading accounts. In response to campaigns by Giacca (sometimes working with others), at least 2 million additional views of fraudulent marketing websites and sales videos were made by prospective investors, and as many as 18,000 individuals were fraudulently induced to open accounts and trade binary options through unregistered brokers. Those investors made initial investments of over $4.5 million.

15.     After initially funding accounts through websites of brokers "recommended" (and, indeed, linked to) by the Marketing Defendants, investors were then often fraudulently induced by those brokers to deposit even more funds. Most investors eventually lost most or all of their money, with total losses in at least the tens of millions of dollars.

5

16.     By virtue of this conduct and other conduct described in this Complaint, the

Marketing Defendants each violated the antifraud provisions of Section 17(a) of the

Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder,

17 C.F.R. 240.10b-5.  The Marketing Defendants each were substantial participants in an

illegal offering or sale of unregistered securities and also violated the registration provisions

of Section 5 of the Securities Act, 15 U.S.C. § 77e.  Defendant Montano is liable for

violations of Section 10(b) of the Exchange Act and Rule 10b-5 directly and also, under

Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b), for activities taken through or by

means of fellow marketers who he enlisted to publish his campaigns.  The Marketing

Defendants are each further liable pursuant to Section 15(b) of the Securities Act, 15 U.S.C.

§ 77o(b), and Section 20(e) of the Exchange Act, as aiders and abettors of each other in fraud

that violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and

Rule 10b-5, and of such fraud by other fellow marketers whose binary options campaigns the

Marketing Defendants substantially assisted to publicize.

17.     By writing scripts, emails, and other materials, and making videos for and

with knowledge of Montano's fraudulent binary options campaigns, and also for and with

knowledge of the fraudulent binary options campaigns of others not named in this Complaint,

Defendant Wright is liable pursuant to Section 15(b) of the Securities Act, 15 U.S.C. §

77o(b), and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), as an aider and abettor of

fraud in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange

Act and Rule 10b-5.

6

18.     The Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, disgorgement of ill-gotten gains, injunctions, and such other relief as the Court deems necessary and appropriate.  Unless restrained and enjoined, each of the Defendants is likely to continue to engage in the acts and practices alleged herein.

### JURISDICTION AND VENUE

19.     The Commission brings this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).  Defendants each have, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the activities alleged in this Complaint, including by making use of the Internet to offer securities and sending or receiving interstate email and participating in interstate voice or video calls.

20.     Venue is proper pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act because Defendants are found in, inhabit, or transact business in the Middle District of Florida, and/or acts and transactions in violation of federal securities laws, as alleged in this Complaint, have occurred within this district, among other places.

### DEFENDANTS

21.     Defendant **Ronald "Ronnie" Canullas Montano** ("Montano") is 40 years old, a citizen of the United States, and resides in Saint Cloud, Florida.  Montano is the managing member of Montano Enterprises LLC ("Montano Enterprises"), a company he formed in 2001, with its principal place of business in Orlando, Florida.

7

22.     Defendant **Travis Stephenson** ("Stephenson") is 32 years old, a citizen of the United States, and resides in Tampa, Florida.

23.     Defendant **Antonio Giacca** ("Giacca") is 40 years old, a citizen of Italy, and resides in the greater Miami, Florida area. Giacca used the alias Antonio Giuditta in connection with some affiliate marketing activities, including in binary options campaigns.

24.     Defendant **Michael Wright** ("Wright") is 63 years old, a citizen of the United States, and resides in Seattle, Washington.

## FACTS

## I.     AFFILIATE MARKETING IN BINARY OPTIONS SECURITIES

25.     Binary options are financial instruments with a value tied to the price of other financial assets, including securities. An investor chooses whether the underlying asset's price will be above or below a certain price at a particular time (*e.g.,* will Apple stock be above $100 per share at 1 p.m. on a particular day). The options are considered "binary" because they carry only two possibilities: the investor whose prediction is correct makes money; the investor whose prediction is incorrect loses the investment. Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset—instead, it is "cash settled."

26.     Binary options referencing a security or securities within the meaning of Section 2(a)(1) of the Exchange Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), are themselves "securities" within the meaning of those provisions.

27.     "Affiliate marketing" is a form of performance-based marketing primarily conducted via email solicitations and promotional materials made available on websites. "Affiliate marketers" typically promote a product or service provided by a third party (*e.g.,* a vendor.)  Affiliate marketers are paid a commission by the vendor when they induce persons to buy the product or service.  Here, binary options brokers paid the Marketing Defendants a pre-set commission (typically $350 to $450) for each person who opened and funded an account with those brokers after viewing fraudulent marketing materials.

## II.     MONTANO'S FRAUDULENT OFFERS OR SALES OF BINARY OPTIONS

28.     Montano was among the first affiliate marketers to enter the field of the fraudulent marketing of binary options.  Between mid-2012 and the first part of 2013, he notified fellow marketers about certain upcoming campaigns called My Binary Code and My Binary Recoded.  Montano contended that these binary options campaigns would pay higher commissions than they could earn in the affiliate marketing of other products.  He added that affiliate marketers earned commissions when an investor opened and funded a trading account and that a call center would follow up on any initial leads that affiliate marketers generated to increase the likelihood of converting the leads to funded trading accounts.

29.     During the Relevant Period, Montano launched at least twenty-one (21) affiliate marketing campaigns for binary options, including:

> (1) Binary Cash Code (from at least 2013);
> (2) Free Cash App (from at least 2013);
> (3) Free Profits (from at least 2013 until at least 2014);
> (4) Trader App (from at least about 2014);
> (5) Automobile Code (from at least October 2014);
> (6) Binary Brain (from at least October 2014);
> (7) Stock Matrix Pro (from at least October 2014);
> (8) Money Platform (from at least January 2015);

(9) Larry's Cash Machine (from at least February 2015);

(10) Live Profits (from at least February 2015);

(11) Copy Trade Profit (from at least April 2015);

(12) Binary Hijack (from at least May 2015);

(13) 3 Week Millionaire (from at least August 2015);

(14) Stock Matrix Pro (2) (from at least December 2015)

(15) Azure Method (from at least 2016);

(16) Centument (from at least January 2016);

(17) Trianasoft (from at least February 2016);

(18) Binary Interceptor (from at least March 2016);

(19) Binary Interceptor (2) (from at least April 2016);

(20) Mobile Binary Code (from at least June 2016); and

(21) Centument Redux/Centument 2.0 (from at least August 2016).

30.     Montano's campaigns typically promoted free software, applications, or trading systems (hereinafter "software") that purported to successfully trade automatically in binary options related to securities and other assets. Montano lured individuals in the marketing materials by promising free access to the software.

31.     The touted software did not exist, or did not produce the results promised. Montano's true goal was not to provide any such software but to earn commissions through brokers by inducing prospects to open and fund a binary options trading account.

32.     Each campaign for binary options that Montano conducted included: (1) a website; (2) at least one video; and (3) emails known as "swipes." Each of these components included materially false or misleading information or artifices or devices designed to elicit interest and deceive recipients with either false statements or false appearances of fact so that recipients would open and fund trading accounts, earning Montano commissions. Montano used these components fully aware of their false, misleading and deceptive nature.

33. The campaigns typically worked as follows:

**Step 1:** Affiliate Marketer writes or retains copywriter (e.g., Wright)
  *Copywriter drafts fictional scripts for videos, website content, and false introductory emails to prospective investors, called "swipes."*

**Step 2:** Affiliate Marketer retains video producer (e.g., Video Producer A) to make videos based on scripts
  *At affiliate marketer's direction, producer hires actors, creates sets, rents props and obtains false screenshots of account statements or other fake "proof."*

**Step 3:** Affiliate Marketer creates website, embeds video, places web site on Internet
  *Web site references "recommended" binary options brokers, sometimes expressly says investors will be trading binary options.*

**Step 4:** Affiliate Marketer recruits "sub-affiliates" to promote campaign, offering commissions as incentives
  *Affiliate marketer also offers prizes to sub-affiliates whose spamming nets most new investors.*

**Step 5:** Sub-affiliates disseminate campaign materials to their email lists, typically tens of thousands of addresses

**Step 6:** People receive spam emails, click on embedded link, go to campaign website, view fictional videos, and are urged to open and fund account to begin auto-trading
  *Videos include false "testimonials" of supposed past users of software describing their proceeds and displaying their rich lifestyles, including luxury homes and cars that are actually rented props. Some videos falsely depict investors opening new accounts "live," in real time, then "refreshing" account balances online to see instant profits.*

**Step 7:** Investors open acct with the campaign's "recommended" binary options broker, provide contact information, and make initial deposit with broker, typically $250.

**Step 8:** Broker receiving investors' initial deposits pays commission to Affiliate Marketer for each investor who funds account after watching marketer's video

**Step 9:** Affiliate Marketer shares commissions with sub-affiliates whose emails induce customers to open and fund new brokerage accts
  *Affiliate marketers (and sub-affiliate spammers) are paid only when persons receiving their marketing materials open and fund a new brokerage account.*

## A.      Montano's Websites

34. In each campaign, Montano sent bulk email solicitations designed to entice recipients to click an embedded electronic link in the email that routed the user to the corresponding binary options campaign website.   The website served as the vehicle through

which Montano carried out the particular binary options campaign. Montano directly or indirectly generated, paid for, and registered the domain names associated with each website, which generally included some variation of the campaign name, e.g., mobilebinarycode.net. He also handled related logistics for the website, such as procuring web hosting services and auto-responders, and placing the finished marketing materials onto the website. Montano reviewed the websites for his launches in advance of going public with them.

35.     The campaigns' websites generally contained multiple webpages. Interested persons arrived at Montano's campaigns' websites by clicking on embedded email links. Montano's webpages uniformly provided a streaming campaign video promoting binary options trades. The webpages also included a field for customers to enter their name and email address to get more information and/or to click to register and fund an account and supposedly gain access to the marketed trading software. Montano mined the personal data entered by interested email recipients in order to add to his email lists for future spamming.

36.     New accounts with a recommended broker could be opened through the webpages registered and hosted by Montano but those pages were controlled by selected brokers or intermediaries. Montano's webpages emphasized clicking on the link to open an account and the importance of opening and funding the new account. The webpages also typically included videos concerning the supposed software product and an "opt-in box" where viewers were urged to provide their email address. Montano created the websites and placed the videos on them for each campaign.

37.    Montano's websites typically said that a minimum of $250 was required to activate the software, but the websites encouraged investors to provide more, saying in words or to the effect that the more you deposit the more your profit will be. This was false.

38.    Montano's websites contained videos or other materials containing false testimonials where actors portrayed themselves as real persons, while never disclosing that their testimonies were fake. Montano's websites also failed to disclose that the testimonials were no guarantee of future performance or success for the typical investor in binary options.

**B.    Montano's Fraudulent Videos**

39.    Montano's binary options websites each contained at least one video about the trading product. Montano created, procured, or used other marketers to procure the videos he touted in his campaigns. For most of the binary options marketing campaigns that he launched on his own, and, working with Wright and others, he intentionally or recklessly included materially false, misleading and deceptive material in the videos that he streamed in campaigns, so as to trick viewers into opening and funding accounts with brokers. At other times, Montano partnered with Stephenson or other fellow marketers who procured the videos for his campaigns.

40.    During the Relevant Period, Montano often retained Video Producer A, who worked with Wright, to produce professional quality videos. Video Producer A produced videos (with and without Wright) for at least eighteen (18) of Montano's campaigns.

41.    These videos included actors and props instead of mere text and voiceovers. Although Montano often paid people to generate these videos, he had substantial input into creating and directing the final product, including writing, editing or approving the scripts,

13

generating story lines, deciding the settings and backgrounds for actors who would pretend to be real individuals, and providing screenshots of fake accounts and trading results to weave into the fake stories. If Montano did not write a script himself, he reviewed all of the scripts, usually made changes, and approved all final versions before sending payments to the writer.

42.    Montano's scripts, as he either wrote, edited or approved them, provided instructions on how to portray scenes to make them enticing and believable. The scripts purported to describe real events, but the statements in the scripts were fiction. The events were not based on actual events; they told made-up stories experienced by make-believe people. Montano knew that his partners in affiliate marketing campaigns did the same thing.

43.    Montano also used so-called "keynote" videos in many of his campaigns. These videos included materially false, misleading and deceptive text and images in a PowerPoint style with an actor reading the text depicted on the screen in the background. Montano paid Wright to create these videos, which were based on scripts Montano provided or Wright wrote for him. Montano often asked Wright to make multiple versions of keynote videos, sometimes even dozens, for a campaign. When creating those videos, Montano asked Wright to include images of luxury items and large homes as props, which Wright did by using stock images from an Internet website, www.istockphoto.com.

44.    Montano's videos included purported trading profits, actors portrayed as the founders of the advertised software with vast experience in trading, and other misrepresentations designed to assure viewers that the information relayed was real even though everything was fake. Montano has never traded binary options and does not know of any real customer experiences that could serve as the basis for events portrayed in his videos.

14

45.     For example, videos by Montano that depicted historical or live trading results were fake. Montano generally supplied Video Producer A with the images of bank and trading account statements to accompany the false statements about earnings and performance as "proof" in his campaign videos. At times, Video Producer A re-used account "proof" from earlier videos. On at least one occasion, Montano provided Video Producer A with a screenshot of Montano's own bank account and asked to disguise the name; Video Producer A then used the image to depict the profits of a successful binary options trader.

46.     Montano's binary option campaign videos not only included false profits, but guaranteed them. His videos generally described use of the software as "risk-free" and promised viewers (with no basis in fact) that they would make outlandish profits.

47.     Video Producer A procured lavish props used for Montano's videos to make it appear as though the advertised software resulted in wealth and to create an overall "life of the rich and famous" image. The props were designed to mislead viewers into believing that success with the automatic trading software enabled the characters to live such lifestyles.

48.     Montano's videos included props like luxury vehicles, a private jet, and mansions—all rented to create the video and not in fact owned or purchased by any user of any software. Montano either specified the type of lavish props to use or approved the props.

49.     Montano's videos also included fake "testimonials" of purported users of the marketed software. For his own videos, Montano wrote or directed Wright to draft testimonials based on fictional characters' pretend experiences and false results.

50.     The testimonials in videos used by Montano's binary options campaigns did not disclose that they may not represent the experience of other users of the marketed

software (if any such software in fact existed), failed to disclose that the testimonials were not a guarantee of future performance (but in fact suggested the results were guaranteed), and failed to disclose that the testimonials were fake and depicted by actors and that the images were mere internet images.

51.   Other common false statements in Montano's campaign videos were designed to convince viewers that they should invest immediately to take advantage of the opportunity. Specifically, they involved the limited availability of the software, or some restriction on the amount of time left to take advantage of the opportunity.

52.   An example of a Montano binary options marketing campaign was "Larry's Cash Machine" ("LCM"), which Montano, partnering with Stephenson, launched in or about February 2015.   Montano, through Stephenson, paid a scriptwriter to create the LCM story, which concerned a supposed Harvard professor who invented software that enabled users to successfully trade in binary options, and who was now offering it for free to investors.  The LCM video included actors posing as actual users, supposed "live" trading, and fake bank and trading account statements showing purported profits from binary options trading resulting from use of LCM.   The video described binary options as "kind of like stocks" but different due to greater return opportunities for investors.  The video included at least the following materially false or misleading statements:

- A Harvard professor invented software that generated over $38 million in binary options profits in just the prior 36 months.

- The "100 percent completely automated" software operates on an "average mathematical certainty" of 97.8% and turns $250 into $4,000 in one day.

- "Julia," who described herself as a single mother in need of cash, was shown opening an account, depositing $250, and then leaving briefly for coffee. Upon returning, she supposedly found that her balance had already increased to $1,489. She was then shown some 11 months later saying that LCM "is 100% real" and that, by using it, she now had $1.87 million in binary trading profits and a new house.

- A testimonial claiming LCM made someone $657 in 60 seconds.

- A testimonial from a hedge fund manager who said his trading profits increased by 544% using LCM.

- A pastor who used profits from LCM to build a new church.

- A 100 test subjects used the software to earn $148 million in less than a year.

53.     Another example of a Montano binary options campaign was "Centument 2.0," which Montano launched in or about August 2016. This campaign featured an actor posing on video as "Gerald Reed," a "superstar trader and software developer" who developed software that supposedly would make its users "extremely wealthy" by executing trades on the binary exchanges automatically. Like the LCM video, the Centument 2.0 video showed supposed "live" trading, fake bank and trading account statements, and guaranteed "100% winning" profits on "binary exchange" trades resulting from use of the marketed software. The video included at least the following materially false or misleading statements:

- Proprietary software was developed by a person named "Gerald Reed" and a team of "superstar coders, programmers and even MIT professors."

- This "Gerald Reed" owns "Centument LTD," a company "about to go public," "launching [an] IPO, [an] initial public offering," and having "IPO underwriters" and "larger investors" backing the company.

- When the software was first launched, "approximately 1,644 Premier Members," or "90%" of the users, "started making over $20,000 a week."

17

- "Overnight, normal people from all walks of life found themselves making tens of thousands of dollars in profits each and every week."

- The software does all the research for a trader through "proprietary algorithms," "trades for you automatically," and, in a new version that fights shady broker countertrades, produces "zero losing trades," "100% winners 100% of the time."

- The software, which now ensures that "[n]o broker can get their hands on your money," is offered for free to people receiving the solicitations. "There's no cost today, tomorrow or next year" to get a copy of the software, and "there's no fine print that'll come back to haunt [an investor] later."

- An investor desiring a free copy must supply an email address that Centument is seeking only "to make sure" that an investor is "not one of the brokers trying to get a hold of [the Centument] software."

54.     False, misleading and deceptive statements of the same nature were typically made in each of Montano's campaigns. Montano ultimately controlled the content of his binary options videos and approved the final copies before posting them to his campaign websites.

**C.     Montano's Fraudulent Emails**

55.     The third fraudulent component of Montano's binary options marketing campaigns was emails. Montano widely and intentionally disseminated his binary options campaigns to millions of email addresses. His campaigns helped him to generate his collection of personal information concerning prospects, including email addresses, for his use in future launches. Montano sometimes sold this information to other affiliate marketers.

56.     Montano's emails (usually disseminated using auto-responders) contained numerous false or misleading statements about the marketed software, such as that users can and have already "made millions" trading with the software system and achieved "mind-

18

blowing results" very quickly.  As with his videos, the emails often created the appearance of urgency by stressing that "spots are limited" or "time is running out."  Montano knew that his emails contained materially false or misleading statements.

57.     Montano hired Wright to craft short, targeted emails ("swipes") for his campaigns.  Swipes were used primarily to prod individuals who received the initial solicitation but did not immediately open and fund an account.  He also used the content to initially spam prospective investors (directly or indirectly with autoresponders).  He made the swipes available to "sub-affiliates"[1] for them to use too while promoting his campaigns.

58.     Sometimes Montano hired Wright to write swipes related to projects Wright had already worked on.  At other times, Montano provided a video or script to Wright and asked him to write swipes based on the information in those materials alone.  When retained, Wright generally drafted, for pay, dozens of unique swipes for a campaign.  For example, Wright drafted forty-seven (47) swipes for Centument 2.0, twenty-eight (28) swipes for Auto Mobile Code, sixty swipes (60) for Azure Method, and thirty (30) swipes for Mobile Binary Code.

59.     All of the swipes Wright prepared for Montano during the Relevant Period included false or misleading statements because they were based on fictional characters and fake trading performance.  Wright knew that the swipes he drafted were false, misleading and deceptive because he made up the information and did not know anything about the actual performance or results of any purported binary options software being marketed.

---

[1]   When a third-party affiliate spammed another affiliate's launch, the third-party affiliate was called a "sub-affiliate."  The role of a sub-affiliate is explained in more detail starting at paragraph 84 of this Complaint.

60.     Some email swipes created the false impression that they originated from the individuals (but who in fact were fictional) depicted in Montano's videos. Even though Montano (or sub-affiliate marketers on Montano's campaign) sent out the swipes, those emails appeared as though they were sent by the individuals featured in the videos. For example, Montano and Stephenson each sent swipes to prospective investors for their LCM campaign as "Larry," the person depicted in the LCM video as the creator of the LCM software. Montano made it appear as though emails to prospects came from the owner or support department of the software so the solicitation looked more persuasive and credible.

61.     In another example, on April 15, 2016, an email from "Support Department" at Trianasoft (using an email address of michael@trianasoftltd.com) claimed the marketed software went viral because "it ACTUALLY WORKS. Believe it or not, there is an actual software out there that's going to allow you to trade Binary Options profitably. . . on COMPLETE autopilot . . . ." On April 19, 2016, an email from "Triana" of Trianasoft Ltd claimed: "We have put years of experience into every element of this software to ensure that it's profitable in 99% of all the trades it makes . . . (No one is perfect) . . . ." In fact, Montano sent these emails, Trianasoft Ltd never existed, and the performance history never occurred.

62.     Montano also sent swipes (directly, through autoresponders, or through sub-affiliates) to remind interested persons to go back to the website and finish setting up their account. On September 23, 2016, for example, an email from "Support Department" for the Binary Interceptor campaign warned that only eight members could take advantage of a matching deposit offer, so the recipient needed to act quickly. The solicitation went on:

> "You have zero risk . . . . And don't worry, the money is still yours
> . . . you're still not paying a single penny for the software that

20

> makes me $10K a day on autopilot . . . . So your money is secure and will still be in your hands . . . . It's like transferring your money into another bank account . . . ."

In fact, when Montano sent such emails, he knew that "zero risk" was a lie, and the report of $10K per day profits trading using the Binary Interceptor System was fake.

63.     Montano created or procured similarly deceptive email swipes for each binary options campaign that he launched.

64.     Montano touted the effectiveness of his swipes to other affiliates, and provided them with examples that Wright wrote for an earlier campaign that had worked well. One of Wright's swipes claimed that a multi-billionaire used the Centument System to make over $100 million a year. Another of Wright's swipes identified Centument LTD, as "one of the leading Binary Options firms in Wall Street." Montano made these swipes available in the Centument campaign for sub-affiliates to use and send out even though all of the information was fake.

65.     Solicitation materials used by Montano often depicted online account screenshots showing trading in the account by the software, or trading that was available through the account or software, in security assets or binary options that reference security assets. For example, the Centument 2.0 video showed nearly a dozen screenshots of trading accounts through which the supposed software and user could trade binary options with reference to stocks and indices. The Mobile Binary Code and LCM videos each showed at least three such screenshots. The Mobile Binary Code explained that an important factor in the marketed software's trading success was its ability to predict trader sentiment about the assets that underlie a binary option, which the host identified as stocks, currencies and

commodities. Screenshots in the Montano videos typically depicted that trades through the software and/or account may be placed with respect to each of these type of assets.

### III.   WRIGHT SUBSTANTIALLY ASSISTED MONTANO AND ANOTHER AFFILIATE MARKETER OF BINARY OPTIONS IN THIS DISTRICT TO FRAUDULENTLY SOLICIT PROSPECTIVE INVESTORS

66.     Montano retained Wright to work on his binary options projects from approximately 2012 through at least September 2016 while Montano resided in this district. As alleged above, Wright wrote and revised various false marketing scripts for the video productions used in some of the Montano campaigns. He also wrote email swipes and produced PowerPoint-type, voiceover videos for Montano's use, either as standalone videos or for insertion into longer videos created by Video Producer A for Montano's campaigns.

67.     Additionally, Wright created scripts, emails and videos for other fraudulent binary options campaigners, including one other affiliate marketer ("Affiliate 1") who resides in this district. Montano and Affiliate 1 were Wright's biggest clients in the Relevant Period.

68.     Wright prepared videos for Montano's earliest binary options campaigns in 2012 to early 2013. By about June 2013, Montano retained Video Producer A, who worked with Wright, to produce more elaborate videos for binary options campaigns. These videos included actors and props instead of just text and voiceovers. Video Producer A often referred the videos and scripts to Wright to create the copy or subtitles for Montano's videos.

69.     During the Relevant Period, Wright worked on materials, including scripts, emails, and/or videos, for at least nine of Montano's campaigns: (1) Binary Cash Code; (2) Automobile Code; (3) Live Profits; (4) Azure Method; (5) Copy Trade Profit; (6) Trianasoft; (7) Binary Interceptor; (8) Centument; and (9) Centument Redux/Centument 2.0.

22

70.     During the Relevant Period, Montano and Affiliate 1 worked together on at least two (2) binary options projects -- Live Profits and Azure Method -- for which Wright helped to create marketing materials.   On at least four occasions, Montano also disseminated fraudulent binary options materials that Wright prepared for a launch by Affiliate 1.

71.     Wright charged Montano based on the number of words in a script, the length of time for a video, and the number of emails he was asked to draft for campaigns.  After reviewing Wright's work product, Montano generally paid Wright for his services via PayPal or wire transfers from accounts Montano accessed in this district.

72.     Wright knew that the binary options solicitation materials that he prepared for marketers, including Montano and Affiliate 1, included materially false, misleading, and deceptive statements.  Wright knew, for example, based on his experience with Montano and other affiliates, that the scripts he wrote for these materials reflected fake trading results and performance.  He also knew they were fake because he made them up without having any knowledge about binary options or the marketed trading software touted in the campaigns.  Also the information Wright received from his clients (including Montano) was vague at best and Wright was tasked with coming up with a fictional story based on generalities to entice prospects to open and fund accounts.  Wright did not believe that the "users" he wrote about or made videos about had actually made the huge returns from the marketed software, yet did his best to make it appear realistic.  Wright re-used income proofs that he had used in previous projects, and some affiliate marketers even told Wright that they would make proof (like bank account screenshots) to match whatever Wright came up with in his materials.

73.     Wright knew that the materials he prepared, including emails, scripts, and videos, would be made available to prospective investors through emails and websites.

74.     Wright knew the purpose of the materials he prepared was to induce prospects to register with a specific broker to open an account and trade binary options.

75.     In preparing marketing materials for Montano's binary options campaigns, and/or assisting Montano or Video Producer A to prepare those materials, Wright willfully and knowingly or recklessly provided substantial assistance to Montano to commit fraud.

76.     For example, in an April 2015 chat between Video Producer A and Wright, Video Producer A described Montano as a "giant scam artist" and Wright acknowledged thinking and wanting to say to the marketers he worked for: "You spoiled f[***]ing piece of scam shit." Wright also wrote: "But I'm a willing participant and I like their money."

77.     By 2015 or early 2016, Wright formed concerns about binary options scams. By spring of 2016, he determined not to work on binary options any longer, especially after Affiliate 1 "expressed concern" and reported that the Commodity Futures Trading Commission was looking into Affiliate 1's involvement with binary options. According to Wright, Affiliate 1 suggested that he not work on binary options anymore and asked him to delete all project files related to binary options and any communications with Affiliate 1. Wright followed those instructions and deleted binary options materials despite being aware of a federal investigation.

78.     Yet around the summer of 2016, Wright accepted Montano's request to revise a binary options script because Montano was persistent and agreed to double Wright's fee. Wright created the script for Centument 2.0, which included materially false or misleading

statements and was developed into a video and used to solicit prospects via the Internet.

Wright then continued to do binary options-related work for Montano through at least

September 2016, including writing over one hundred swipes for at least three campaigns.

## IV.   MONTANO AND STEPHENSON PARTNERED TO CARRY OUT AT LEAST THREE OF MONTANO'S FRAUDULENT BINARY OPTIONS CAMPAIGNS

79.    Montano worked with Defendant Stephenson on at least three campaigns,

commencing around 2014. Stephenson sought to partner with Montano because he was

known as "king" in the affiliate marketing community with "huge" spamming capabilities.

Stephenson hoped to leverage Montano's reputation to generate support from other sub-

affiliates for his own campaigns. Stephenson relied on Montano's lead lists to get campaigns

they worked on together started, which in turn showed sub-affiliates that the campaign was

successful and worthy of their time. Montano partnered with Stephenson because he was too

busy to generate the solicitation materials himself, but wanted to launch new campaigns.

80.    As alleged above, Montano and Stephenson worked together to launch the

LCM campaign. Montano directed Stephenson to hire a specific copywriter and Video

Producer A for the LCM campaign. Stephenson also hired a designer to work on the LCM

website and worked with Montano to populate the website with content. Stephenson

managed the backend logistics and Montano served as the "face" by recruiting sub-affiliates.

The campaign succeeded and they split the advertiser profits and costs.

81.    Montano then asked Stephenson to manage in the same way his next

campaign, Copy Trade Profit, and Stephenson again received a portion of the profits.

25

82.     After Copy Trade Profit, Stephenson generated false and misleading marketing materials for the Binary Hijack campaign. Stephenson then partnered with Montano to cause these materials to be disseminated. Montano served as the affiliate by using his name to recruit sub-affiliates who then disseminated the Binary Hijack marketing materials. Stephenson received a portion of the profits from this campaign too.

83.     Stephenson knew that his profits in partnering with Montano depended on successfully inducing investors to register with a broker to open and fund an account for trading binary options. He also knew that the binary options sales materials he generated and/or caused to be disseminated in campaigns with Montano contained materially false, misleading and deceptive statements and would defraud recipients of those materials.

## V.     MONTANO RECRUITED OTHER AFFILIATE MARKETERS TO DISSEMINATE HIS FRAUDULENT CAMPAIGNS

84.     During the Relevant Period, Montano was among various other affiliate marketers, in the U.S. and elsewhere, who created and disseminated the type of fraudulent binary options marketing materials described in this Complaint. Montano and these other affiliates depended on each other to "support" their respective campaigns through email spams, in order to reach as many investors as possible. The affiliate who launched a new campaign paid other affiliates to spam the new campaign's materials to these other affiliates' email lists, which vastly broadened the number of persons who received the marketing materials. Such email lists ranged from thousands to millions of addresses. When another affiliate spammed an affiliate's launch, the other affiliate was called a "sub-affiliate."

85.     The major affiliate marketers for binary options, in the U.S. and abroad, coordinated the scheduling of their campaigns, ensuring that they did not launch competing

campaigns on the same date. As launch dates approached, an affiliate announced his upcoming campaign and asked his colleagues in fraud to support his campaign (in a sub-affiliate role) by emailing potential investors. The affiliate marketer provided his marketing materials to sub-affiliates to spam prospective investors using the sub-affiliates own email lists. The affiliate launching a new campaign typically shared his commissions with those sub-affiliates who successfully induced a customer in the sub-affiliates' email lists to open and fund a trading account at the affiliate's broker. Montano participated in these activities.

86.     Montano recruited sub-affiliates to spam his latest binary options campaigns. He offered to pay sub-affiliates a portion of his own commission each time an investor, after receiving Montano's marketing materials from a sub-affiliate, opened and funded an account with the campaign's recommended broker. Montano retained the difference between the total commission and the portion paid-out to sub-affiliates as his profit. Montano has testified that he purposely did not watch any of the videos before providing them to the sub-affiliates because he said they were "too long" and because he already knew they were false.

87.     Montano often ran contests with prizes for his launches to encourage sub-affiliates to promote his campaigns more aggressively. Montano regularly paid thousands of dollars in prizes and in at least one instance offered a Ferrari to the winner.

## VI.    MONTANO ALSO ACTED AS A SUB-AFFILIATE BY SPAMMING OTHER MARKETERS' BINARY OPTIONS CAMPAIGNS

88.     In addition to launching his own campaigns, Montano acted as a sub-affiliate during the Relevant Period and disseminated fraudulent solicitations in the U.S. and abroad for at least fourteen (14) fraudulent binary options advertising campaigns launched by other affiliate marketers. These binary options campaigns included:

(1) Binary Matrix Pro (from at least March/April 2014);

(2) A.I. App. (from at least April 2015);

(3) Home Online Earners (from at least April 2015);

(4) Cash Code (from at least June 2015);

(5) Peak Profits (from at least July 2015);

(6) 10k in 7 Days (from at least September 2015);

(7) Overnight Profits (from at least September 2015);

(8) Auto Profit Signals (from at least September 2015);

(9) Coffee Cash Cheat Sheet (from at least November 2015);

(10) Medallion(aire) App (from at least December 2015/January 2016);

(11) Binary Bank Breaker (from at least February 2016);

(12) Stark Trading System (from at least February 2016);

(13) Cloud Trader (from at least March 2016); and

(14) Trade Tracker Pro (from at least March 2016).

89.     These binary options campaigns worked like the campaigns Montano himself

launched, including by deceiving potential investors through a website, one or more videos,

and various email swipes. As with Montano's own campaigns, these campaigns routinely

included materially false or misleading information or artifices or devices designed to elicit

interest and deceive recipients with either false statements or false appearances of fact so that

recipients would be enticed to open and fund binary options trading accounts. As with the

campaigns Montano himself launched, these campaigns typically touted "free" and

"automatic" trading with software that did not exist, offered false guarantees of extraordinary

profits, and used false proof in the form of fabricated account statements, fictitious "live"

demonstrations, and fake testimonials. As with his own campaigns, Montano's goal was not

to provide any software that worked as claimed but to earn commissions through

"recommended" brokers by inducing prospects to open and fund a binary options account.

90.     When acting as a sub-affiliate for other marketers' campaigns, Montano

received commissions for each customer to whom he sent the affiliate's materials, and who

opened and funded an account. Montano frequently earned prizes based on his performance,

including thousands of dollars and a Rolex watch. Montano, for example, came in first place (i.e., generating the greatest number of account openings) among sub-affiliates for the Binary Bank Breaker campaign, Stark Trading System, and Trade Tracker Pro campaigns.

91.     Montano sent millions of solicitation emails when acting as a sub-affiliate for others' binary options campaigns. As with his own campaign materials, Montano knew or was reckless in not knowing that what he disseminated via email as a sub-affiliate were materially false, misleading and deceptive. He in fact may not have reviewed some of the materials at all. Yet he knew from the experience of creating and using his own materials, and the materials commonly used by his fellow marketers in soliciting investors, that the materials he disseminated as a sub-affiliate were designed to trick investors.

## VII.   MONTANO ALSO PARTNERED ON CAMPAIGNS WITH BROKER INTERMEDIARIES AND AS AN AFFILIATE WITH OTHER AFFILIATE MARKETERS BESIDES STEPHENSON

92.     Montano often, if not always, coordinated his marketing campaigns for binary options brokers through intermediary brokers rather than coordinating with individual brokers directly. Montano would work with a broker intermediary that maintained direct relationships with binary options marketers and with brokers. As alleged, Montano received commissions *only if* prospects opened and deposited funds in the accounts of brokers, and in particular, the brokers specifically identified or linked in the fraudulent marketing materials. If customers received Montano's campaign materials and did not open and fund an account with those particular brokers, Montano received nothing. The broker intermediary coordinated with Montano and brokers to launch campaigns that would result in large numbers of customers opening and funding binary options accounts with those brokers.

93.     For example, the broker intermediary selected the "recommended" brokers identified on Montano's campaign websites and directed investors to particular brokers to open accounts and begin binary options trading.  The intermediary also worked with brokers to ensure that their sales representatives personally solicited customers who received Montano's campaign videos but did not immediately open accounts, to encourage them to fund accounts and begin trading.  The broker intermediary also worked to ensure that brokers used Montano's fraudulent marketing materials to re-solicit these prospective customers via email and sales calls.  For example, before he launched a new marketing campaign, the intermediary disseminated links to the campaign website to brokers with instructions for them to view the site or watch the video.

94.     The broker intermediary also handled Montano's commission payments.  The intermediary received those funds from the brokers and made the payments to Montano.

95.     None of the binary options securities offered or sold to investors as a result of Montano's marketing campaigns was registered as a security with the Commission.

96.     Montano sometimes partnered with broker intermediaries for the supply of his marketing materials, or partnered with other affiliate marketers besides Stephenson.  This occurred on at least eight of the twenty-one campaigns that Montano launched (listed in paragraph 29).  On most of those occasions, Montano recruited other affiliates to widely disseminate the fraudulent solicitations for the campaign even though he did not have as much direct involvement in creating the materials.  Still, Montano reviewed or at least approved the materials used for all of his campaigns, and he intentionally or recklessly

launched and disseminated the solicitations, despite inclusion of materially false, misleading and deceptive materials in the campaigns.

97.     During the Relevant Period, Montano partnered with a Broker Intermediary A for materials on at least two campaigns: the first iterations of Centument and Binary Interceptor. For those campaigns, Intermediary A supplied Montano with marketing materials for Montano to launch and Montano retained all of the profits from the campaigns.

98.     Montano partnered with another Broker Intermediary B on at least one other campaign, Trader App, and retained most of the profits from that venture.

99.     Montano partnered with affiliate marketers besides Stephenson in at least five campaigns. Montano partnered with these other affiliates to avoid appearing as though he were using all of the available launch dates for himself, including on at least: Free Profits, Money Platform, Live Profits, 3 Week Millionaire, and Azure Method. Montano's major role was recruiting sub-affiliates to disseminate these campaigns. He split the profits from these campaigns with the other affiliates and retained about 30% to 40% of the proceeds. At a minimum, Montano also had a direct role in creating the marketing materials for Money Platform, Free Profits, and Azure Method as part of these partnering arrangements.

## VIII.  GIACCA'S FRAUDULENT OFFERS OR SALES OF BINARY OPTIONS

100.    Between at least August 2013 and August 2017, Defendant Giacca conducted fraudulent binary options campaigns similar to those of Montano's campaigns.

101.    Giacca typically partnered with another individual on his campaigns and, during this period, involved himself directly in at least thirty (30) fraudulent binary options campaigns that he either generated and/or launched to millions of individuals.

102.     Giacca began working as an affiliate marketer around 2009 or 2010.  In late summer 2013, he began working in binary options affiliate marketing.

103.     By about August 2013, Giacca began creating binary options marketing materials and recruiting sub-affiliates to disseminate those materials.  Giacca often brainstormed ideas for new campaigns together with another individual and then primarily created or procured the videos and email solicitations.  The other individual handled backend operations.

104.     Between at least August 2013 and August 2017, Giacca launched or substantially participated in at least the following thirty (30) fraudulent binary options marketing campaigns:  (1) The ATM Machine (3kpertrade.net; 2013); (2) System X (get1kpounds.com, the-1k-challenge.net; late 2013/early 2014); (4) Big Cash Giveaway (April 2014); (5) Secret Millionaires Club (April 2014); (6) Millionaires Society (May 2014); (7) 60kin60seconds (June 2014), (8) Insider Confessions (July 2014); (9)  Secret Wealth Club (July 2014); (10) Profit Prophecy (September 2014); (11) Millionaire Conspiracy (November 2014); (12) The Truth About Cash (December 2014); (13) (Secret) Millionaire's Society (2014); (14) Free Profit Code (November 2014); (15) Money Platform (January 2015); (16) 60 Second Millionaire (March 2015); (17) Private Society (June 2015); (18) 7 Figure Club (August 2015); (19) Push Button Salary (September 2015); (20) 7 Figure Challenge (December 2015); (21) Profits with Cindy (2015); (22) Altronix App (February 2016); (23) Perpetual Formula (May 2016); (24) Million Dollar Challenge (May 2016); (25) Quantum Code (June 2016); (26) Zero Loss Formula (August 2016); (27) Unlimited Systems (late 2016/early 2017); (28) Millionaire's Club (2016); (29) Orion Code (2016); and (30)

Infinity App (March 2017). Giacca's campaigns included at least one campaign, Money

Platform (launched in January 2015), in aid of a campaign by Montano.

105.    For each launch, Giacca split the profits fifty-fifty with the individual

handling the backend operations on his campaigns, except when they partnered with other

marketing affiliates, in which case they shared a reduced portion of the total proceeds.

106.    Like Montano's campaigns, Giacca's campaigns, on websites, in sales videos,

and in mass-distributed emails, touted "free" and "automatic" trading software by showing

fake proof in the form of fabricated bank and trading account statements, fictitious "live"

demonstrations, fake testimonials, and false guarantees of profits. Although Giacca's

materials guaranteed software would automatically generate significant profits for investors

once they opened and funded a binary options account with a "recommended" broker, the

software touted did not exist or, if it ever did exist, failed to produce the results promised.  In

each of his thirty campaigns, Giacca intentionally or recklessly included such false and

deceptive information.

107.    For example, in the Infinity App video, an actor falsely claimed: "Six years

ago I developed this piece of software that makes money online 100% on autopilot 24hrs per

day and it has NEVER failed to make profits for even a single day in the last 6 years." The

video describes the trading software as "zero risk," includes fake bank statements,

testimonials from actors about fake results, and even goes so far as to assert that "every

single person using the Infinity App to this date has become a millionaire." None of those

statements are true, nor do they reflect real trading activities and results from Infinity App.

108.    In another example, a campaign video Giacca launched promised that the
Quantum Code trading software is the "only, 100% guaranteed way to make profits every
day forever" with "No losses, 100% wins, 100% guaranteed simply because of near Quantum
speed from our trading software." The actor playing a fictitious character named Michael
Crawford showed a fake bank account statement supposedly holding over $44 million of
Quantum Code profits and falsified screenshots showing over 7,000 trades placed and the
same number won resulting in over $1 billion in profits since 2006.  The Quantum Code
video also showed "Crawford" supposedly flying in a private jet and then visiting Quantum
Code's offices, where actors wore shirts containing a fake Quantum Code logo.

109.    Similar false, misleading and deceptive statements and "proof" were a
hallmark of Giacca's videos to lure customers to make their way through the website page
and open and fund a binary options trading account so that he (and the individual he worked
with) could get paid.

110.    Giacca knew that the binary options campaigns he created and disseminated
were materially false, misleading and deceptive and resulted in scamming thousands of
individuals who funded new binary options accounts on the basis of his campaigns.

111.    Giacca went by the alias Giuditta in connection with his affiliate marketing
activities to avoid tarnishing his real name.  He even joked with other affiliate marketers
about pulling off their scams, targeting the elderly, and other similar statements.

112.    As a result of his binary options campaigns, Giacca, directly or indirectly, sent
over 94 million solicitations to prospective investors throughout the United States and abroad
to lure them into opening and funding binary options accounts.

113.    In response to such campaigns, at least 2 million views of fraudulent marketing websites and videos were made by prospective investors, and as many as 18,000 individuals were fraudulently induced to open accounts and trade binary options through websites operated by unregistered brokers. Those investors made initial investments of over $4,600,000. After funding accounts, investors were then often induced to deposit even more.

## IX.    MONTANO TRIED TO COVER HIS TRACKS

114.    Montano deleted all documents related to binary options by mid-2016. While he claims that he deleted these materials as a routine matter because he left the binary options niche, he did not similarly delete materials concerning his other types of affiliate marketing.

115.    In late 2017, Montano contacted Wright and informed him that Video Producer A had received a subpoena in an investigation by the Commission and that Montano's name had come up. Montano asked whether Wright had also received a subpoena. Montano was nervous about on-going investigations and described himself to Wright as a mere "consultant" related to binary options projects. Wright knew that Montano directed the projects Wright had been involved with and did not act as a mere consultant, but Wright understood from the conversation with Montano that Montano was trying to distance himself from binary options activities.

116.    Montano primarily communicated with Wright via Skype during the Relevant Period. Around late 2017 or January 2018, he told Wright to sign up for Telegram, another communication service, so that they could communicate there instead of through Skype. Montano told Wright over Telegram that he did not want a record of their conversations.

## X.   MONTANO SCAMMED THOUSANDS OF INDIVIDUALS, EARNING HIMSELF MILLIONS OF DOLLARS

117.    Montano, directly, indirectly, and through sub-affiliates, disseminated over 14 million fraudulent solicitations for at least 21 campaigns.  Montano's fraudulent videos for those campaigns were viewed over a million times, and between an estimated 9,000 to 10,000 new binary options trading accounts were opened as a result.  Based on the brokers' $250 minimum deposit, those customers initially deposited into their trading accounts an estimated $2.2 to $2.5 million.

118.    Montano and Stephenson, directly, indirectly, or through sub-affiliates, disseminated over 4 million fraudulent solicitations for the LCM, Binary Hijack and Copy Trade Profit campaigns alone.  Those fraudulent campaign videos were viewed over approximately 400,000 times, resulting in between about 3,300 to 4,250 new binary options trading accounts with initial deposits between $825,000 and $1,062,500.

119.    For two of the five binary options campaigns that Montano launched with affiliate marketers besides Stephenson, Montano and those other marketers jointly disseminated (directly, indirectly, or through sub-affiliates) at least an estimated 10 million fraudulent solicitations, the videos were viewed at least an estimated 100,000 to 200,000 times, and at least an estimated 2,000 customers opened new trading accounts with initial deposits of at least approximately $500,000.

120.    Montano's remaining fraudulent videos for the 21 campaigns were viewed over an estimated 600,000 times and resulted in at least an estimated 3,688 new binary options trading accounts funded with at least approximately $922,000.

121.    As alleged above, Montano earned additional commissions by acting as sub-affiliates for other fraudulent binary options campaigns.  Montano also frequently won cash and other prizes for promoting sub-affiliates campaigns.

122.    During the Relevant Period, Montano earned over $5,000,000 related to affiliate marketing.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### FIRST CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities
Violations of Section 17(a) of the Securities Act
(against Montano, Stephenson and Giacca)**

123.    Paragraphs 1-122 are realleged and incorporated by reference herein.

124.    Each of Montano, Stephenson and Giacca, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)  with scienter, employed devices, schemes, or artifices to defraud;

(b)  obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

125.    By reason of the foregoing, each of these defendants violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (against Montano, Stephenson and Giacca)

126.    Paragraphs 1-122 are realleged and incorporated by reference herein.

127.    Each of Montano, Stephenson and Giacca, by engaging in the conduct

described above, directly or indirectly, in connection with the purchase or sale of a security,

by the use of means or instrumentalities or interstate commerce, of the mails, or of the

facilities of a national securities exchange, with scienter:

(a)   employed devices, schemes, or artifices to defraud;

(b)   made untrue statements of a material fact or omitted to state a material

fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)   engaged in acts, practices or courses of business which operated or would

operate as a fraud or deceit upon other persons.

128.    By reason of the foregoing, each of these defendants violated, and unless

enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

### Unregistered Offer or Sale of Securities
### Violations of Section 5 of the Securities Act
### (against Each of Montano, Stephenson and Giacca)

129.    Paragraphs 1-122 are realleged and incorporated by reference herein.

130.    No registration statement had been filed or was in effect for any of the security-based binary options offered or sold through any of the marketing campaigns launched or circulated by Montano, Stephenson or Giacca.

131.    Each of Montano, Stephenson and Giacca, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such securities.

132.    By reason of the foregoing, each of these defendants violated, and unless enjoined will again violate, Section 5 of the Securities Act, 15 U.S.C. §§ 77e.

### FOURTH CLAIM FOR RELIEF

**Fraud In Connection with the Purchase or Sale of Securities
By or Through Means of Others;
Violations of Section 20(b) of the Exchange Act
(Against Montano)**

133.    Paragraphs 1-122 are realleged and incorporated by reference herein.

134.    Montano with scienter created and disseminated such marketing materials as described above by and through the means of others and in the various manners described above.

135.    Montano, for example, enlisted sub-affiliates to spam his fraudulent binary options campaign materials to millions of prospective investors.  He offered to pay sub-affiliates for each time a prospect, after receiving materials from a sub-affiliate, opened and funded a binary options account with the campaign's recommended broker.  He also ran contests that offered prizes to the most successful sub-affiliates, to create incentives for further disseminating these fraudulent campaigns.  He worked through the entity that he

owned and controlled, known as Montano Enterprises LLC, to commit fraudulent acts and undertake his fraudulent activities. He also partnered with Stephenson and other affiliate marketers to commit fraud.

136. By exercising control of or providing directives or incentives to the foregoing persons, including Montano Enterprises, Stephenson, other marketing affiliates, and sub-affiliates, Montano also disseminated materially false and misleading binary options marketing materials by and through those persons. Montano controlled, directed, or incentivized the dissemination of such materials by and through these persons that he created or caused to be created and/or that other affiliate marketers created and then provided to him for dissemination (that is, where he acted on others' campaigns as a sub-affiliate marketer).

137. By reason of the foregoing, Montano directly or indirectly engaged in acts and things which it would be unlawful for Montano to do under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by and through the means of other persons, in violation of Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b). Unless enjoined, Montano will again violate Section 20(b) of the Exchange Act.

### FIFTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Aiding and Abetting Violations of Section 17(a) of the Securities Act**
**(Against Montano, Stephenson and Giacca)**

138. Paragraphs 1-122 are realleged and incorporated by reference herein.

139. Montano, Stephenson and Giacca each violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a). Montano and Stephenson also knowingly or recklessly provided substantial assistance to each of the other's violations of Section 17(a). Giacca knowingly or

recklessly provided substantial assistance to violations of Section 17(a) by other affiliate marketers launching fraudulent binary options campaigns, including at times Montano.

140. By reason of the foregoing, Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), deems each of Montano, Stephenson and Giacca to be in violation of Section 17(a) of the Securities Act to the same extent as the others to whom such assistance by each of them was provided, and unless enjoined, each of them will again aid and abet violations of Section 17(a).

## SIXTH CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against all Montano, Stephenson and Giacca)

141. Paragraphs 1-122 are realleged and incorporated by reference herein.

142. Montano, Stephenson and Giacca each violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Montano and Stephenson also knowingly or recklessly provided substantial assistance to each of the other's violations of Section 10(b) and Rule 10b-5 thereunder. Giacca knowingly or recklessly provided substantial assistance to violations of Section 10(b) and Rule 10b-5 by other affiliate marketers launching fraudulent binary options campaigns, including at times Montano.

143. By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), deems each of Montano, Stephenson and Giacca to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as the others to whom such assistance

by each of them was provided.  Unless enjoined, each of them will again aid and abet

violations of those provisions.

## SEVENTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Aiding and Abetting Violations of Section 17(a) of the Securities Act
### (Against Wright)

144.    Paragraphs 1-122 are realleged and incorporated by reference herein.

145.    Wright knowingly or recklessly provided substantial assistance to violations

of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by Montano, assisting Montano by

creating marketing materials for at least nine of his campaigns during the Relevant Period.

146.    By reason of the foregoing, Section 15(b) of the Securities Act, 15 U.S.C. §

77o(b), deems Wright to be in violation of Section 17(a) of the Securities Act to the same

extent as Montano to whom such assistance was provided.  Unless enjoined, Wright will

again aid and abet violations of Section 17(a).

## EIGHTH CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Wright)

147.    Paragraphs 1-122 are realleged and incorporated by reference herein.

148.    Wright knowingly or recklessly provided substantial assistance to violations

of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17

C.F.R. § 240.10b-5, by Montano, assisting Montano by creating marketing materials for at

least nine of his campaigns during the Relevant Period.

149.     By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. §
78t(e), deems each of them to be in violation of Section 10(b) of the Exchange Act and Rule
10b-5 to the same extent as Montano to whom such assistance was provided.  Unless
enjoined, Wright will again aid and abet violations of those provisions.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

a)     Find that Defendants committed the alleged violations;

b)     Order Defendants to disgorge, with prejudgment interest, all ill-gotten
gains he or it received or derived from the activities set forth in this Complaint, and to
repatriate any ill-gotten funds or assets he caused to be sent overseas;

c)     Order Defendants to pay civil penalties under Section 20(d) of the
Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §
78u(d)(3);

d)     Order all Defendants prohibited from, directly or indirectly, including
through any entity he owns or control, participating in the marketing, offer or sale of
securities over the Internet or by email or other forms of electronic communication;

e)     Permanently enjoin Defendants Montano, Stephenson and Giacca from
directly or indirectly violating Sections 5 and 17(a) of the Securities Act, 15 U.S.C. §§
77e & 77q(a), and Sections 10(b) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) &
78t(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

f)      Permanently enjoin Defendant Wright from directly or indirectly violating

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

g)      Retain jurisdiction over this action in order to implement and carry out the

terms of all orders and decrees that it may enter, or to entertain any suitable application or

motion for additional relief within the jurisdiction of this Court; and

h)      Grant such other and further relief as may be necessary or appropriate.

## JURY TRIAL DEMAND

The Commission demands a jury trial on all issues triable of right by a jury.

Dated:  September 27, 2018

Respectfully submitted,

Kenneth W. Donnelly (trial counsel)
DC Bar No. 462996
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949
Tel. (202) 551-4946
Fax (202) 772-9282
Email: donnellyk@sec.gov

Attorney for Plaintiff
**Securities and Exchange Commission**

Of Counsel:

Jennifer A. Leete
Michael S. Fuchs
Jason M. Anthony