UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

     v.

RONALD C. MONTANO, TRAVIS
STEPHENSON, ANTONIO GIACCA and
MICHAEL WRIGHT,

    Defendants; and

DENISE MONTANO, ROMEO MONTANO,
ELMA MONTANO, AND REM FLORIDA
PROPERTIES, LLC,

    Relief Defendants.

Case No. 6:18-cv-01606-GAP-GJK

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANT RONALD C. MONTANO ON THE ISSUE OF LIABILITY**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, Plaintiff, the Securities and Exchange Commission ("SEC"), hereby moves for partial summary judgment against Defendant Ronald C. Montano ("Montano") on the issue of liability. In support, the SEC submits the following Memorandum and Exhibits.

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT RONALD
<u>C. MONTANO ON THE ISSUE OF LIABILITY</u>**

**INTRODUCTION**

Montano operated a scheme to collect information from U.S. investors on behalf of foreign binary options brokers under the guise of providing investors with free trading software. The advertising for the campaigns told investors that the free software – purportedly created by a Harvard professor, a professional gambler, or a famous Wall Street trader – was guaranteed to make investors rich through binary options trading. As proof, the advertising included fake testimonials from the inventors and users of the software, fake "real time" demonstrations of the software in use, and fake bank statements showing results achieved through use of the software. What investors actually received by clicking through Montano's websites was a transfer of their information to a binary options broker who sold investors binary options on foreign, unregistered exchanges. Contrary to the advertised guarantees of success, investors did not become millionaires; many of them lost their entire life savings. Montano, on the other hand, made millions in commissions for every investor who funded a binary options trading account as a result of his marketing campaigns.

**FACTS**

Montano was actively involved in binary options marketing by at least 2013. Declaration of Travis Stephenson at ¶9.[1] Binary options allow investors to "bet" that a given asset will be above or below a certain point at a specific time. *See SEC v. Banc de Binary LTD.,* 964 F. Supp. 2d 1229, 1231 (D. Nev. 2013). Each binary options marketing campaign at issue here included a promotional email or "swipe" with a link to a webpage, the webpage itself, and a promotional

---

[1] Supporting Declarations are attached as **Ex. A1-A9**.

video or "Video Sales Letter" also called a "VSL." Stephenson Dec. at ¶6-8.

Marketers who created the campaign's advertising content and hosted the campaign website were referred to as "Affiliates." Investigative Testimony of Ronald C. Montano at 189-90.[2] Affiliates disseminated their own campaign swipes and also arranged for other marketers, called "Sub-Affiliates," to email campaign swipes. Stephenson Dec. at ¶22; Montano Inv. Tr. at 89. The Affiliate received a commission of between $250 and $400 for each investor who funded a binary options trading account. Montano Inv. Tr. at 125-26; 667-670. Stephenson ¶26; Declaration of Antonio Giacca at ¶9. The Affiliate paid a smaller commission to the Sub-Affiliate who had emailed the swipe to the investor. *Stephenson Dec.* at ¶26. *Id.* Montano acted as both an Affiliate and a Sub-Affiliate for binary options marketing campaigns.

## I. MONTANO'S MISREPRESENTATIONS AND OTHER DECEPTIVE CONDUCT.

### A. Montano Acted as an Affiliate for at least 21 Binary Options Campaigns.

Montano alone, and in combination with others, served as the Affiliate for at least 21 binary options campaigns between 2013 and 2016.[3] *See also* **Ex. C**. Exhibit C includes marketing material for several campaigns where Montano served as either the Affiliate or the Sub-Affiliate and also includes evidence establishing his involvement with each campaign. Some of the evidence is in the form of the advertisement itself, which includes Montano's post office box as

---

[2] Copies of cited portions of testimony are attached as **Ex. B1-B6**.

[3] *See* Berry Dec. at ¶¶ 8, 35; Montano Inv. Tr. at 295:5-12, 391:18-392:24, 396:11-25, 686:5-9 (Auto Binary Code/Binary Cash Code, Binary Brain, Stock Matrix Pro, Stock Matrix Pro II, Binary Interceptor 2, Centument 2/Redux, Copy Trade Profit, Mobile Binary Code, and Trianasoft); Stephenson Dec. at ¶¶15-17, 28, and 30; Montano Inv. Tr. at 212, 371:21-372:9, 686:5-9 (Larry's Cash Machine and Binary Hijack); Brookshire Dec. at ¶14; Montano Inv. Tr. at 378:1-21, 379-81(3 Week Millionaire, Money Platform, and Live Profits); Giacca Dec. at ¶17 (Free Profits).

the sender's address.  Montano Inv. Test. Tr. at 564-65 (identifying 12472 Lake Underhill Road, #423, Orlando, Florida, 32828 as his post office box).  In other cases, Montano's involvement is evidenced by chats and emails with other binary options marketers.

### 1.  The Content of Montano's Marketing Materials.

As the Affiliate, Montano instructed video producers and writers he hired on the creation of the advertising material.  Montano wrote, edited, and approved scripts, generated story lines, decided the settings and backgrounds for actors who would pretend to be real individuals, provided screenshots of his bank account to use as "proof" of results, and instructed the content creators to create fake images of "actual" trading results to weave into the fake stories.  Berry Dec. at ¶17 ("Montano was very involved in the video production process in all the videos I made for him."); *id.* at ¶¶17-20 and 34.  *See also* Wright Inv. Test. Tr. at 75 ("A project for Ronnie would be like ten projects for a typical client, demanding and intense and multiple versions of the same thing."); *id.* at  113-14, 164-65 (Montano "wrote his own scripts"); 189-90 and 218-19 (Montano's script included instructions such as, "say these words in slow motion," and "Show image of couple wealthy and background of huge house with exotic cars"); 218-19 (Montano typically asked content creator to include images of luxury items which creator would obtain from stock photos or from Montano himself).

Each campaign began with an email "swipe," often drafted by a professional writer and made available to sub-affiliates to use in promoting Montano's campaigns.  Montano Inv. Test. Tr. at 234.  The emails used fictitious sender names to make it appear that they came from the person or company that supposedly invented the software.  Stephenson Dec. at ¶22-23; **Ex. C.** at 106, 118 and 166 (email for "Larry's Cash Machine" appeared to come from "Larry"; email for

Magnetic Profits appeared to come from "Binary Option News;" email for Trianasoft campaign appeared to come from "Michael" at "Trianasoft ltd" or "Monica Anderson").

The text of the emails included misrepresentations about the creation of the software, such as:

> Over the past 2 weeks, I've been secretly testing a brand new trading software[.]****I got the idea from a multi-billionaire. It's the system he uses to mak[e] over 100 Million a year. I took his strategy and implemented it into a highly sophisticated artificially intelligent software and then automated it so that it's easy for me and my family to use. We've been using this software for the past 2 days and the results are just mind blowing.

**Ex. C** at 80 (Centument email swipe) and 168 (Trianasoft email swipe claiming "We have put years of experience into every element of this software to ensure that it's profitable in 99% of all the trades it makes"). The emails often created the appearance of urgency by stressing that a limited number of spots "are going to fill up fast." **Ex. C.** at 60. The swipes also included claims that binary options trading is risk free and results were guaranteed:

> "You have zero risk . . . . And don't worry, the money is still yours . . . you're still not paying a single penny for the software that makes me $10K a day on autopilot . . . . So your money is secure and will still be in your hands . . . . It's like transferring your money into another bank account . . . ."

**Ex. C** at **65**.

Email recipients who clicked on the link embedded in the email were taken to a campaign website that included a promotional video which was set to automatically begin playing. Brookshire Dec. at ¶ 10. The videos featured individuals claiming to have created binary options trading software or system, including a Harvard professor named Larry, a "top financial trader" named "Howard Kessler of MBC Capital," and "Superstar trader and software developer Gerald Reed." The videos include fake testimonials from supposed investors claiming to have achieved incredible results that allowed them to lead more comfortable, and in some cases, lavish lifestyles

with luxury vehicles, a private jet, and mansions.  *See* **Ex. D** and **Ex. E.**  Exhibit D is a disc containing several Montano videos, while **Ex. E** includes a list of time stamps in the videos where various misrepresentations can be found along with multiple screenshots from the videos.

For example, the Larry's Cash Machine video included the following materially false or misleading statements:

- A Harvard professor invented software that generated over $38 million in binary options profits in just the prior 36 months.

- The "100 percent completely automated" software operates on an "average mathematical certainty" of 97.8% and turns $250 into $4,000 in one day.

- "Julia," who described herself as a single mother in need of cash, was shown opening an account, depositing $250, and then leaving briefly for coffee.  Upon returning, she supposedly found that her balance had already increased to $1,489.  She was then shown some 11 months later saying that LCM "is 100% real" and that, by using it, she now had $1.87 million in binary trading profits and a new house.

- A testimonial claiming LCM made someone $657 in 60 seconds.

- A testimonial from a hedge fund manager who said his trading profits increased by 544% using LCM.

- A pastor who used profits from LCM to build a new church.

- 100 test subjects used the software to earn $148 million in less than a year.

*See* **Ex. D** (Larry's Cash Machine Video) at 00:00-00:54; 00:55-2:04; 6:43-7:44; 19:20-30:01; 30:43-31:26; 31:28-32:47; 30:09-30:42.  *See also* **Ex. E** at 13, 17-20.

Another example of a Montano binary options campaign was "Centument 2.0," which featured an actor posing on video as "Gerald Reed," a "superstar trader and software developer" who developed software that supposedly would make its users "extremely wealthy" by executing trades on the binary exchanges automatically.  The Centument 2.0 video showed supposed "live" trading, fake bank and trading account statements, and guaranteed "100% winning" profits on

trades resulting from use of the software.  The video included at least the following materially false or misleading statements:

- Proprietary software was developed by a person named "Gerald Reed" and a team of "superstar coders, programmers and even MIT professors."

-  "Gerald Reed" owns "Centument LTD," a company "about to go public," "launching [an] IPO, [an] initial public offering," and having "IPO underwriters" and "larger investors" backing the company.

- When the software was first launched, "approximately 1,644 Premier Members," or "90%" of the users, "started making over $20,000 a week."

- "Overnight, normal people from all walks of life found themselves making tens of thousands of dollars in profits each and every week."

- The software does all the research for a trader through "proprietary algorithms," "trades for you automatically," and, in a new version that fights shady broker countertrades, produces "zero losing trades," "100% winners 100% of the time."

- The software, which now ensures that "[n]o broker can get their hands on your money," is offered for free.  "There's no cost today, tomorrow or next year" to get a copy of the software, and "there's no fine print that'll come back to haunt you later."

- An investor desiring a free copy must supply an email address that Centument is seeking only "to make sure" that an investor is "not one of the brokers trying to get a hold of [the Centument] software."

*See* **Ex. D** (Centument Video) at 00:04; 00:11-00:19; 04:01-04:13; 5:12-5:18; 07:07-07:17; 07:18-07:38; 07:40-07:41; 08:12-08:15; 08:39-08:45; 09:10-09:22; 09:39-09:52.  *See also* **Ex. E** at 3-4, 6, 11-12.

The campaign websites told investors that, by submitting their contact information investors would be provided with free software:

Simply Access and Activate Binary Hijack to Become One Of the Lucky Few Who Sees Life Altering Case Flowing Into Their Bank Account DAILY! Limited Sports Available! Only 078 Free Licenses REMAINING! (from a total of 100)

**Ex. C.** at 47 (Binary Hijack).  The websites also claimed that investors' information would never be shared with anyone.  *Id.* (Binary Hijack).

What actually happened when investors submitted their information was that the investors were redirected to the website of one of two Israeli broker "aggregators."  Montano Inv. Test. Tr. at 98-100, 148.  The broker aggregators, in turn, referred the investors to one of several specific binary options brokers referred to as "brands."  As Montano testified:

> MR. MONTANO:  [T]hey [investors] get redirected after -- they type in the e-mails, click submit, and then after they click submit, it goes -- it opts in to the auto responder, and then they get redirected to [aggregators] Boost or BOA.
>
> MS. PASSMAN:  Right.  And you're the one that sets up the redirect right, to Boost or BOA?
>
> MR. MONTANO:  Yes.  The link that they give me is the one that -- yes.  Correct.
>
> ****
>
> MR. MONTANO:  They give me the link, and I put the link in the redirect once they click on submit, and then they're redirected to Boost and BOA's funnel after that.

Montano Inv. Test. Tr. at 238-39.

## 2. Montano's Marketing Materials were Deceptive and Included Material Misrepresentations.

Montano wholly fabricated the statements made in the advertising materials he created for his campaigns.  Montano conceded in his investigative testimony that he had never spoken to anyone who had actually traded in binary options, that the advertising materials he created were not based on actual results or actual people, and that he did not know of any results achieved by anyone through binary options trading.  Montano Inv. Test. Tr. at 621-23.  Montano further testified that the "product" he was providing investors was not software, but a referral to a binary options broker.  Montano Inv. Test. Tr. at 107:15-g8 (describing the "product" as "how to make money in binary options . . . Using, you know, this – this specific brand," *i.e.* broker).  Moreover, at his deposition, Montano refused to answer whether he knew that the email swipes, videos, and

8

websites he created for his binary options marketing campaigns were false and deceptive on the grounds that it might incriminate him.  Montano Dep. Tr. at 7, 13-15, 33, 53, 55, 69-70, 108.

### B.  As a Sub-Affiliate, Montano Disseminated Fraudulent Binary Options for other Marketers.

Montano also served as a Sub-Affiliate for binary options campaigns between 2013 and 2016.  These campaigns feature pretend inventors of software, fake customer testimonials, fake results, and fake guarantees.  **Ex. C** at 65, 69, 74, 146-157, 166, 182-183.  *See also* Berry Dec. at ¶¶8-10 and 15.  Montano knew that those marketers for whom he acted as a Sub-Affiliate made up the claims in their marketing materials just as Montano did for his own campaigns.  Indeed, Montano provided fellow marketers with examples of his own advertising for use in their binary options marketing campaigns.  **Ex. C** at 80-82.  Moreover, at his deposition, Montano refused to answer whether he knew that the advertising he disseminated as a Sub-Affiliate was false and deceptive on the grounds that it might incriminate him.  Montano Dep. Tr. at 64-68.

### C.  Montano Made Fraudulent Offers to Millions for which Montano was Paid Millions.

Montano used a variety of methods to obfuscate how much he was paid for binary options marketing.  The broker aggregators paid Affiliates through non-US payment processors called Clicksure and Clickbetter; Affiliates paid Sub-Affiliates through the same platform.[4]  These services provided marketers with detailed records of commission payments owed and made to them.  *See* **Ex. I** (Example of Clicksure Commission Statement).  Montano destroyed these commission records, and all other records relating to binary options, although it was not his regular

---

[4] Montano Inv. Test. Tr. at 119:21-120:25, 249:13-250:3, 268:1-8, 275:20-279:7, 313:8-318:4, 466:5-467:25; Brookshire Dec. at ¶¶ 13-14.

practice to do so.[5]  To further complicate matters, Montano had some of his commission payments paid to a resident of Switzerland named Martin Schranz and to various members of Montano's family.  *See* D. Montano Dep. at 78-81; E. Montano Dep. at 21-23; R. Montano Dep. at 45-47; *See also* **Ex. J** (Martin Schranz Payment Record); and **Ex. K** (REM Payment Record).  Notwithstanding Montano's spoliation and obfuscation, the evidence shows that Montano disseminated binary options marketing materials to millions and was paid millions in commissions.

Montano had a list of 250,000 email addresses to which he marketed binary options campaigns.  **Ex. C** at 164.  *See also* Montano Inv. Test. Tr. at 623-626.  Without even considering the number of people to whom Montano's Sub-Affiliates sent marketing materials, or the number of people to whom Montano sent marketing materials as a Sub-Affiliate, sending email swipes to every email address on Montano's list for all 21 campaigns where Montano was an Affiliate would have resulted in dissemination to over 5 million email addresses.  The campaigns where Montano served as an Affiliate induced at least 10,000 new investors to open accounts.[6]  At a rate of $250

---

[5]  After testifying that he had not deleted any records related to binary options and that it was not his regular practice to do so, Montano claimed that he had deleted everything relating to binary options and that it was his regular practice to delete all materials relating to an industry or "vertical" when he stopped marketing for that industry.  Montano conceded, however, that the only industry he had deleted materials for was binary options and that he had not deleted materials related to other industries he no longer marketed.  Montano Inv. Test. Tr. at 30-35, 68-70.  Montano also took steps to influence the testimony of others as to his role.  For example, after learning that Bill Berry, one of the video producers Montano used, was being investigated in connection with binary options, Montano suggested to Michael Wright, another content creator, that Montano had only been an advisor in connection with the binary options marketing materials he had paid Wright to make.  *Id.* at 22-27, 30-35, 447, 569-73.  *See also* Wright Inv. Test. Tr. at 35-36 (Montano instructed Wright to communicate with him via an app that did not keep records of conversations).

[6]  Stephenson Dec. at ¶¶29, 28, and 31 (Larry's Cash Machine, Copy Trade Profit, and Binary Hijack resulted, respectively, in 3,000, 600–1,000, and 200-250 new binary options accounts); Giacca Dec. at ¶17 (Money Platform and Free Profits each resulted in 1,000 new binary options accounts); Brookshire Dec. at ¶14 (a single Sub-Affiliate to Montano's 3 Week Millionaire, Binary Brain, Binary Interceptor, Centument, Free Cash App, Money Platform, Live Profits, and Trianasoft campaigns was credited with 533 new binary options accounts).

to $400 for each investor, Montano would have been paid between $2,500,000 and $4,000,000. As a Sub-Affiliate, Montano also earned commissions. For a single campaign, Montano received over $10,000 in Sub-Affiliate commissions.[7] These numbers are conservative as evidenced by the fact that, from 2013 through 2016, Clicksure and Clickbetter paid Montano over $6 million. Patrick Dec. at ¶15. In addition to commissions, Montano also won prizes for being a top Sub-Affiliate for other marketers' campaigns.[8] The prizes that Montano won include a $38,000 cash prize and a Rolex watch valued at more than $25,000. Montano Inv. Test. Tr. at 387:16-1, 505:25-506:25; **Ex. C** at 27, 28, 33, 40, 71, 72, 102, 104, 120, 145, 165, and 177.

## II.    MONTANO ENGAGED IN AN OFFER OF UNREGISTERED SECURITIES.

From 2013 through 2016, the two Israeli aggregators to whom Montano redirected investors, Boost and BOA Elite, listed 51 different brokers or "brands" to which they referred investors. **Ex. F-1** and **F-2**. These brokers allowed investors to "bet" on the prices of both securities and commodities. **Ex. G** at 3.[9] None of the 51 brokers registered any security with the SEC from 2012 through 2016. **Ex. A-7** (SEC Record Attestations).

---

[7] Montano Inv. Test. Tr. at 387:16-1, 505:25-506:25, 682:15-685:3, 709:15-22; Patrick Dec. at ¶¶ 18, 22, 35.

[8] Montano Inv. Tr. at 387:16-1, 505:25-506:25, 682:15-685:3, 709:15-22; Brookshire Dec. at ¶18.

[9] The SEC obtained copies from the Internet Archive a/k/a the "Wayback Machine" of Boost's and BOA Elite's web pages, which list the binary options brokers they made referrals to, at several different times from 2013 through 2016. The SEC also obtained copies from the Internet Archive of the listed brokers' asset lists. The Internet Archive is of such acknowledged accuracy that the Court is entitled to take judicial notice of information available there. *See, e.g., Pond Guy, Inc. v. Aquascape Designs, Inc.* 2014 WL 2863871, *4 (E.D. Mich. 2014) (courts may take judicial notice of the web pages available through the "Wayback Machine" because the contents can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned) (citing authorities in the First, Second and Federal Circuits). *See also Erickson v. Neb. Mach.* Co., 2015 WL 4089849, at *1 n.1 (N.D. Cal. 2015) (same).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant establishes that there is no genuine issue of material fact, the opposing party must come forward with "specific facts" showing that there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-moving party cannot satisfy its burden by creating "some metaphysical doubt as to material facts," or by raising "conclusory allegations" and "unsubstantiated assertions," or even by offering by a mere "scintilla" of evidence in its own favor. *Id.* Because Montano destroyed evidence relating to his binary options marketing and refused to answer questions at his deposition based on the Fifth Amendment, even on summary judgment, the Court may infer that the evidence Montano destroyed and Montano's own testimony would not have been favorable to him. *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1261-62, 1268 (S.D. Fla. 2011) ("*Monterosso I*"), *aff'd* 756 F.3d 1326 (11th Cir. 2014) (*Monterosso II*). *See also SEC v. Goble,* 682 F.3d 934, 947-48 (11th Cir. 2012) (an adverse inference may also be drawn where a party destroys or tampers with evidence).

## ARGUMENT

I. **MONTANO VIOLATED § 10(b) AND RULE 10b-5 OF THE EXCHANGE ACT AND § 17(a) OF THE SECURITIES ACT.**

A violation of Section 10(b) is established upon proof that the defendant (1) engaged in deceptive conduct[10] or made a materially false misrepresentation; (2) in connection with the sale

---

[10] Rule 10b–5(a), which applies to "any device, scheme, or artifice to defraud, and Rule 10b-5(c), which applies to any "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" are collectively referred imposing "scheme liability" and referred to herein as "deceptive acts." Section 17(a)(1) and (3) are the corresponding scheme liability provisions under the Securities Act.

or purchase of securities; (3) with intent to defraud or with recklessness; and (4) the use of interstate commerce, the mails, or a national securities exchange.  15 U.S.C. § 78j; 17 C.F.R. 240.10b-5.  The elements of a claim under Section 17(a) are the same except that Section 17(a) applies to conduct "in the offer or sale" of securities; if the fraudulent act alleged is a misrepresentation, the defendant need not have made the misrepresentation but must have obtained money or property as a result of it; and if the fraudulent act alleged is deceptive conduct, negligence will suffice.  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (negligence sufficient for deceptive conduct); 15 U.S.C. 77q(a)(2) (defendant must have obtained money or property).

### A.  Montano Engaged in Deceptive Acts and Disseminated Material Misrepresentations.

#### 1.  Montano Engaged in Deceptive Acts.

Sections 17(a) and 10(b) recognize that "[c]onduct itself can be deceptive."  *US v. Bachynsky,* 415 Fed. Appx. 167, 172 (11th Cir. 2011) (citation omitted).  Marketing made, not for the purpose of selling the product touted, but rather, to draw a customer in to buy a different, more profitable product is a deceptive practice.  *See Zlotnick v. Premier Sales Group, Inc.,* 431 F. Supp. 2d 1290, 1295-96 (S.D. Fla. 2006) ("bait and switch" is deceptive) (interpreting state consumer law). Other examples of deceptive acts include falsifying documents, presenting opinion or false factual statements as "independent research," and presenting fake testimonials.  *Monterosso I*, 768 F. Supp. 2d at 1269  (defendants committed securities fraud when they altered invoices from third parties to make it appear that companies' subsidiaries were engaging in sales that generated revenue); *ZPR Investment Management, Inc. v. SEC,* 861 F.3d 1239, 1254-55 (11th Cir. 2017) (publicly-traded company's failure to provide material information to an independent firm that published research reports about publicly-traded companies was a deceptive act); *CFTC v. Scharf,*

No. 3:17-cv-774-J-32MCR (M.D. Fla. Apr. 25, 2019) (fake testimonials are fraudulent devices within the meaning of Commodity Exchange Act provision nearly identical to the anti-fraud provisions of the securities laws).[11]  The Supreme Court has recently held that misrepresentations can also qualify as deceptive conduct.  *Lorenzo v. SEC,* 139 S. Ct. 1094, 1100 (2019) (investment banker who disseminated misrepresentations drafted by his supervisor with intent to defraud engaged in deceptive act).

Here, Montano engaged in all of these deceptive acts.  He led investors to believe that, by submitting information through Montano's website, or the websites of his fellow marketers, the investors were signing up to use free software.  In reality, clicking the "submit" button only transferred investors to the landing page of a foreign broker aggregator who would subsequently refer the investor to a foreign broker.  To induce investors to submit their information, Montano sent emails from fictitious software inventors and companies, disseminated testimonials of actors claiming to be inventors and software users enjoying extravagant lifestyles, and disseminated fabricated documents purportedly showing the software in use and profits obtained from its use. Both as an Affiliate and a Sub-Affiliate, Montano disseminated false statements claiming that the software was invented by knowledgeable persons, had a proven track record, was guaranteed to get results, and was risk free.

### 2.  Montano is the Maker of Material Misrepresentations under Section 10(b) and Obtained Money through Material Misrepresentations under 17(a).

Montano is the maker of material misrepresentations with respect to the campaigns where he served as an Affiliate.  A person makes a misrepresentation for purposes of Section 10(b) where he has "ultimate authority over the statement, including its content and whether and how to

---

[11]  Authorities interpreting the Commodity Exchange Act are persuasive in interpreting the nearly identical anti-fraud provisions of the securities laws.  *See In re Commodity Exchange, Inc.*, 213 F.Supp.3d 631, 672 (2016).

communicate it." *Janus Capital Group, Inc. v. First Derivative Traders,* 564 U. S. 135, 142 (2011). Here, Bill Berry, a video producer who made several videos for Montano, testified that "Montano reviewed the videos, controlled their content, directed revisions, and approved the final versions." Berry Dec. at ¶20.  Michael Wright, who wrote scripts and email swipes for Montano, testified that Montano had "to approve the final version of the script" and "always had the final say as to what the content was of anything" Wright created.   Wright Inv. Test. Tr. at 239-40.   Montano also controlled how his own campaigns were disseminated by posting the campaign materials on a third-party service called Clicksure where only Sub-affiliates within Montano's "network" could obtain copies to disseminate.   Montano Inv. Test. Tr. at 94, 227-28.   For purposes of Section 10(b), Montano obtained money through misrepresentations when he acted as an Affiliate and a Sub-Affiliate.   In both cases, Montano received a commission for each investor who funded a binary options count as a result of the marketing materials he disseminated.

All of the marketing material Montano disseminated, as an Affiliate or a Sub-Affiliate, was false because the claims were created by the marketers themselves.  The false statements were material because there was a substantial likelihood that they would have been viewed by a reasonable investor as significantly altering the total mix of information available.   *SEC v. Corporate Relations Group,* No. 99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. March 28, 2003).  Where a misstatement is "so obviously important to an investor that reasonable minds cannot differ on the question of materiality," summary judgment is appropriate.  *Monterosso I*, 768 F. Supp. 2d at 1263 (citation omitted).  Testimonials touting results and claims that an investment is guaranteed or risk-free are always material.  *See, e.g., SEC v. Reynolds,* 2010 WL 3943729, *3 (N.D. Ga. 2010) (claims that investment was guaranteed or risk-free were material) (granting summary judgment for SEC); *CFTC v. Alocer,* 2013 WL 12104892, * 7 (S.D. Fla. 2013) (claims

that forex trading was risk-free and that results with foreign exchange dealer were guaranteed were material); *CFTC v. Heffernan,* 2006 WL 2434015, *7 (D.S.C. 2006) (fake testimonials touting trading system was material) (granting summary judgment for CFTC).

### B. Montano's Deceptive Conduct and Material Misrepresentations were made in Connection with the Sale, and in the Offer and Sale, of Securities.

Section 10b and Rule 10b-5 of the Exchange Act prohibit fraud "in connection with" the sale of securities.  A sale covers situations when victims took or tried to take an ownership interest in a security.  *Chadbourne & Parke LLP v. Troice,* 134 S. Ct. 1058, 1060 (2014).  Section 17(a) of the Securities Act prohibits fraud "in the offer or sale" of securities.  An "offer" includes "every attempt  . . . or solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C. 77b(a)(3).  Section 10b and Rule 10b-5's "in connection with" is defined broadly to cover all situations when the fraud and the offer or sale of securities "coincide."  *SEC v. Zandford*, 535 U.S. 813, 822 (2002) ("the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.").  Similarly, Section 17(a)'s "in the offer or sale" is expansive enough "to encompass the entire selling process."  *U.S. v. Naftalin*, 441 U.S. 768, 773 n.4 (1979).

"A statement can be made 'in connection with' the purchase or sale of a security even if the violator does not actually own the securities or engage in the relevant securities transactions." *SEC v. Norstra Energy, Inc.,* 202 F. Supp. 3d 391, 397 (S.D.N.Y. 2016).  Disseminating misleading marketing materials satisfies the "in connection with" requirement if the purpose of the marketing is to induce a securities sale.  The requirement is satisfied "whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon, regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator."  *SEC v. Corporate Relations Group Inc.,* Case No. 6:99-CV-1222-ORL-28-KRS, 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003) (citation omitted).  With respect to

Section 17(a), even though a communication may not be "couched in terms of an express offer," publicity efforts "which have the effect of conditioning the public mind or arousing public interest in the issuer or its securities constitute an offer." Guidelines for Release of Information by Issuers Whose Securities are in Registration, SEC Rel. 33-5180, 1971 WL 120474 (Aug. 20, 1971); Publication of Information Prior to or After the Effective Date of a Registration Statement, SEC Rel. No. 33-3844, 1957 WL 3605, at *2 (Oct. 8, 1957); Securities Offering Reform, SEC Rel. 33-8591, 2005 WL 1692642 (Aug. 3, 2005) (reaffirming 1971 Guidelines).

The case of *Corporate Relations Group* is instructive. There, just like here, the defendants did not themselves sell securities, but were paid by third parties to promote them. The marketing material was made to look as if the defendants were providing independent opinions about the securities as opposed to paid marketing. The court found that, although defendants did not sell the securities themselves, their fraudulent conduct was made in connection with the sale of securities. "The obvious purpose of the promotional articles was to induce readers to invest." *Id.* In short, the SEC has established that Montano's fraud was committed "in connection with" and in the "offer or sale" of securities. *See also SEC v. Hui Feng*, No. 15-CV-09420, 2017 WL 6551107, at *10 (C.D. Cal. Aug. 10, 2017) (defendants who used misrepresentations to promote third-party investments in exchange for commissions committed fraud "in connection" with purchase or sale of securities); *Norstra Energy, Inc.,* 202 F. Supp. 3d at 397-98 (newsletter promoting securities, but presented as independent opinion, was made "in connection with" securities, although publisher did not issue securities); *SEC v. Coplan,* No. 13-62127, 2014 WL 695393, at *5 (S.D. Fla. Feb. 24, 2014) ("Rule 10b-5 is violated whenever assertions are made . . . in a manner reasonably calculated to influence the investing public, *e.g.*, by means of the financial media.") (citation omitted); *SEC v. Blavin,* 557 F. Supp. 1304, 1310-11 (E.D. Mich. 1983) (defendant who

purchased large quantities of stock, then circulated newsletters touting stock, which he then sold made material omission by failing to disclose his interest in stock) ("The sole purpose of the newsletters was to recommend the purchase of certain stock"). *Cf. CFTC v. R.J. Fitzgerald*, 310 F.3d 1321, 1324 (11th Cir. 2002) (broker who made misrepresentations when advertising strategy of buying and selling commodities based upon weather events committed fraud in connection with commodity contracts).

### C.  Montano Acted With Scienter.

Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976).  Evidence that a defendant engages in misrepresentations or other conduct that the defendant knows presents a danger of misleading investors, or which is so obvious that the defendant must have been aware of the danger, establishes the requisite intent.  *SEC v. Ginsburg,* 362 F.3d 1292, 1298 (11th Cir. 2004).  Where a defendant fabricates documents and other information to provide to securities investors, no reasonable juror could conclude that the defendant did not have the requisite scienter, mandating the entry of summary judgment.  *Monterosso II,* 756 F.3d at 1326 (where defendants fabricated invoices that they knew company's accountants would rely upon in reporting the company's finances, there was no genuine issue of material fact as to scienter) (upholding district court's grant of summary judgment).

Here, Montano fabricated the claims in his own campaigns and assisted other marketers to do so for their campaigns.  Moreover, Montano's failure to answer questions about his knowledge and intent gives rise to the inference that Montano knew the marketing material he disseminated was false and that he intended to investors to be deceived by it.  Montano Dep. Tr. at 7, 13-15, 33, 53, 55, 64-70, 108.  Based on this evidence, no reasonable juror could conclude

that Montano did not know that investors were likely to be deceived by the marketing material he disseminated for his own campaigns and that of others.  *Monterosso II,* 756 F.3d at 1326.[12]

### D. Montano's Actions were taken through the Instrumentalities of Interstate Commerce.

Use of the internet falls squarely within the penumbra of interstate commerce.  *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("[t]he internet is an instrumentality of interstate commerce."); *SEC v. Levin*, No. 12-21917-CIV, 2013 WL 594736, at *12 (S.D. Fla. Feb. 14, 2013) (the Internet, which necessarily includes email, is an "instrumentality of interstate commerce.").  Here, Montano disseminated fraudulent binary options marketing material through the email and via webpages on the internet, all within interstate commerce.

## II.     MONTANO VIOLATED § 20(B) OF THE EXCHANGE ACT.

Section § 20(b) makes it unlawful for any person, directly or indirectly, to violate the Exchange Act "through or by means of any other person."  15 U.S.C. 78t(b).  Here, by paying other Sub-Affiliates to engage in deceptive acts and disseminate misrepresentations on his behalf, Montano violated Section 20(b).  *See, e.g., SEC v. Sethi Petroleum, LLC,* 229 F. Supp. 3d 524, 541 (E.D. Tex. 2017) (individual defendant who instructed sales representatives to make false statements to potential investors liable under Section 20(b); granting summary judgment for SEC).

## III.    MONTANO AIDED AND ABETTED TRAVIS STEPHENS' VIOLATIONS OF § 10(b) AND RULE 10b-5 OF THE EXCHANGE ACT AND § 17(A) OF THE SECURITIES ACT.

Both the Exchange Act and the Securities Act impose liability upon those who aid and abet violations thereof.  15 U.S.C. §§ 77o(b) and 78t(e).  An aiding and abetting claim requires proof of three elements:  (1) a primary or independent securities law violation committed by another

---

[12] At a minimum, Montano was negligent in engaging in deceptive acts, which is sufficient for liability under Section 17(a)(1) and (2).

party; (2) awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper; and (3) the aider and abettor knowingly or recklessly substantially assisted the conduct that constitutes the violation. *SEC v. K.W. Brown & Co*., 555 F. Supp. 2d 1275, 1306 (S.D. Fla. 2007); *see also* Section 15 U.S.C. 78t(e). The element of substantial assistance is met when, based upon all the circumstances surrounding the conduct in question, a defendant's actions are a "substantial causal factor" in bringing about the primary violation. *Id.*

Former co-defendant Travis Stephens violated the anti-fraud provisions of the securities laws by acting, in concert with Montano, as an Affiliate in the dissemination of three fraudulent binary options campaigns. Stephenson Dec. at ¶15-17, ¶28, ¶30. Montano substantially assisted Stephens by managing communications with broker aggregators, creating email swipes, recruiting Sub-Affiliates, providing Sub-Affiliates with swipes, maintaining campaign web pages, and creating video and web page content. Stephenson Dec. at ¶¶16-20, ¶28, ¶30. The same facts that establish Montano's scienter for primary violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act establish that Montano knew that the use of fraudulent marketing to promote binary options was wrongful.

## IV.  MONTANO VIOLATED §5 OF THE SECURITIES ACT

Sections 5(a) and 5(c) of the Securities Act prohibit any person from selling a security through interstate commerce "[u]nless a registration statement is in effect as to [such] security," or from offering to sell or offering to buy a security "unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(a) and (b). To establish a *prima facie* case for violation of Section 5, the SEC must show that (1) securities were offered or sold for which no registration statement was filed or in effect; (2) the offering or sale was made through the means or instruments of transportation or communication in interstate commerce or the mails; and (3) defendants,

directly or indirectly, offered or sold the securities. *SEC v. Friendly Power Co., LLC,* 49 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999)

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, in part, "any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or ***based on the value thereof***)." 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 78c(a)(10) (emphasis added). The SEC and at least one court have held that an options dependent on the price of a security satisfies the definition of security as an "option," while another court has held that a binary option is a security because it is a privilege. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 325 (2d Cir. 2002) (a synthetic option contract based on the value of Philip Morris stock was an "option" security under the Exchange Act even though investor never acquired an interest in the stock); *see also* Release No. 34-55871, 2007 WL 2031576 *6-8 (June 6, 2007) (binary option based on the value of security is an option security for purposes of Exchange Act); *Banc de Binary,* 964 F. Supp. 2d at 1237 (binary option is a privilege security).

Without regard to whether a binary option is a security because it is an option or a privilege, the binary options based on securities that were sold by Boost and BOA Elite's brokers were not registered with the SEC. **Ex. A-7**.

Montano indirectly offered binary options based upon securities through his marketing efforts. "Even where the person or entity does not have individual contact with the purchasers of the securities, that person or entity has indirectly offered or sold that security to the public if he or it has employed or directed others to sell or offer them, or has conceived of and planned the scheme by which the unregistered securities were offered or sold." *Friendly Power,* 49 F. Supp. 2d at 1371. Section 5 does not exclude from its coverage those who participate "in all except the final

steps of a planned offering." *Id.* (citation omitted).  Section 5 imposes liability on a person who is a "necessary participant" or a "substantial factor" in the offering or selling of the unregistered securities." *Id.* (defendants who incorporated entities that engaged a telemarketing firm to solicit investments in unregistered securities were liable for Section 5 violations); *Levin,* 2013 WL 594736, *10 (defendant who managed the day-to-day operations of corporation's investments, drafted the promissory notes that were the unregistered securities offered, and marketed the promissory notes was liable under Section 5).  Here, the SEC has established that Montano violated Section 5 by participating in the scheme to fraudulently induce investors into funding binary options accounts.

## CONCLUSION

For the reasons set forth above, partial summary judgment should be granted and the Court should find Montano liable for the foregoing violations of the securities laws.

Dated:  November 21, 2019                    Respectfully submitted,

/s/ Kenneth W. Donnelly
Kenneth W. Donnelly (trial counsel)
DC Bar No. 462996
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949
Tel. (202) 551-4946
Fax (202) 772-9282
Email: donnellyk@sec.gov

/s/ Samantha M. Williams
MD Bar No. 12190024
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949
Tel: (202) 551-4061
Fax: (202) 772-9292
Email: williamssam@sec.gov

Attorneys for Plaintiff
*Securities and Exchange Commission*

**CERTIFICATE OF SERVICE**

I certify that, on November 21, 2019, I served the foregoing paper on all parties via ECF


/s/ Samantha M. Williams
Attorney for Plaintiff

**EXHIBITS**
**IN SUPPORT OF SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## A.  DECLARATIONS

| EX. | DATE | DESCRIPTION |
|---|---|---|
| 1. | Various | SEC Web Capture Affidavits |
| 2. | 3/14/19 | William Berry Declaration (w/out attachments) |
| 3. | 3/20/19 | Travis Stephens Declaration (w/out attachments) |
| 4. | 3/21/19 | Grayson Brookshire Declaration (w/out attachments) |
| 5. | 3/21/19 | Antonia Giacca Declaration |
| 6. | 5/16/19 | Joseph Patrick Declaration (selected attachments only) |
| 7. | 11/15/19 | SEC Record Attestations |
| 8. | 11/21/19 | Catherine De Lorenzo Declaration |
| 9. | 11/21/19 | Arthur Tornabene-Zalas Declaration |

## B.  EXCERPTS FROM TESTIMONIAL TRANSCRIPTS

| EX. | DATE | DESCRIPTION |
|---|---|---|
| 1. | 2018 | Ronald C. Montano Investigation Testimony Transcript |
| 2. | 2018 | Michael Wright Investigation Testimony Transcript |
| 3. | 2019 | Ronald C. Montano Deposition Transcript |
| 4. | 2019 | Denise Montano Deposition Transcript |
| 5. | 2019 | Elma Montano Deposition Transcript |
| 6. | 2019 | Romeo Montano Deposition Transcript |

## C.  BINARY OPTIONS MARKETING EMAILS, WEBPAGES, AND SCRIPTS

| DESCRIPTION | PAGE NO. |
|---|---|
| 3 Week Millionaire | 1-26 |
| 10k in 7 Days | 27 |
| AI App | 28-29 |
| Alive in 5 | 30-33 |
| Auto Profit Signals | 34-35 |
| Azure Method | 36-39 |
| Binary Bank Breaker | 40 |
| Binary Brain Trust | 41-45 |
| Binary Hijack | 46-56 |
| Binary Interceptor | 57-63 |
| Binary Interceptor 2 | 64-68 |
| Binary Matrix Pro | 69-73 |
| Cash Code | 74-76 |
| Centument | 77-83 |

| | |
|---|---|
| Centument 2.0 | 84-85 |
| Cloud Trader | 86-87 |
| Coffee Cash Cheat | 88-90 |
| Copy Trade Profit | 91-93 |
| Free Cash App | 94-96 |
| Free Profits | 97-102 |
| Home Online Earners | 104 |
| Larry's Cash Machine | 105-113 |
| Live Profits | 114-117 |
| Magnetic Profits | 118-121 |
| Medallionaire App | 122 |
| Midas Touch App | 123-124 |
| Mobile Binary Code | 125-128 |
| Overnight Profits | 129-134 |
| Peak Profits Formula | 135-138 |
| Phoenix Trading Formula | 139-140 |
| Secret Wealth Club | 141-144 |
| Stark Trading System | 145 |
| Stock Matrix Pro | 146-157 |
| The Freedom Project | 158-164 |
| Trade Tracker Pro | 165 |
| Trianasoft | 166-174 |
| Virtual Income | 175-178 |
| Wealthy Wheat Trader | 179-194 |
| Zulander Hack | 195-198 |

**D.  BINARY OPTIONS MARKETING VIDEOS (Submitted Via Disc)**

| EX. | DESCRIPTION |
|---|---|
| 1. | Binary Brain |
| 2. | Binary Hijack |
| 3. | Binary Interceptor |
| 4. | Cash Code |
| 5. | Centument |
| 6. | Centument Redux/Centument 2.0 |
| 7. | Free Cash App |
| 8. | Larry's Cash Machine |
| 9. | Live Profits |
| 10. | Mobile Binary Code |
| 11. | Stark Trading System |
| 12. | Stock Matrix Pro |

**E.  BINARY OPTIONS MARKETING VIDEOS QUOTE COMPILATION & SCREEN SHOTS**

**F.  BOA ELITE & BOOST BROKER LISTS**

| EX. | DATE | DESCRIPTION |
| --- | --- | --- |
| 1. | 2013-15 | BOA Elite Broker Lists |
| 2. | 2015 | Boost Broker List |

**G.  ASSET LISTS OF BINARY OPTIONS BROKERS USED BY BOA ELITE**

| EX | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| G-1 | | 1-40 |
| G2 | | 41-86 |
| G3 | | 87-114 |

**H.  ASSET LISTS OF BINARY OPTIONS BROKERS USED BY BOOST**

**I.  CLICKSURE COMMISSION STATEMENT**

**J.  PAYMENTS TO MONTANO FAMILY MEMBERS**

**K.  PAYMENTS TO REM FLORIDA PROPERTIES, LLC**