UNITED STATES DISTRICT COURT OF
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff,**

v.                                                                                  Case No: 6:18-cv-1606-GAP-GJK

**RONALD C. MONTANO, TRAVIS STEPHENSON, ANTONIO GIACCA and MICHAEL WRIGHT,**

        **Defendants.**

**ROMEO A. MONTANO, ELMA C. MONTANO, REM FLORIDA PROPERTIES, LLC, and DENISE MONTANO,**

        **Relief Defendants.**

---

**DEFENDANT RONALD MONTANO'S RESPONSE IN OPPOSITION
TO THE SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
THE ISSUE OF LIABILITY AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 56and Local Rule 3.01, defendant Ronald C. Montano ("Montano") hereby files this Response in Opposition (the "Response") to the SEC's Motion for Partial Summary Judgment [D.E. 99] (the "Motion").[1]

**I.   INTRODUCTION**

From 2013-16, Montano sometimes developed or assisted with the development of marketing campaigns for trading software that purportedly allowed users to make money by

---

[1] Since there are several substantive similarities in the cases brought by the SEC and CFTC against Montano in their motions for summary judgment, in case numbers 6:18-cv-1606 and 6:18-cv-1607, respectively, Montano is constrained to repeat and share substantially similar general arguments in his responses in oppositions in each case. The responses do differ in several material ways, however, not the least of which is in addressing the specific, different counts.

1

trading binary options. Montano acted as a marketing professional in this capacity, accepting information from foreign entities for those campaigns, and always working with a team of other professionals for the finished product.

The marketing campaigns developed by Montano and the teams Montano worked with are no different than the marketing campaigns created by marketing professionals for products ranging from computers to toothpaste on a daily basis. Indeed, Montano has developed marketing campaigns for business opportunities, education, and coffee, to name but a few. The reason that this case exists is because, unlike Montano's work with business opportunities, education, and coffee, the trading software featured in some of Montano's work or emails from 2013-16 allegedly would allow users to trade binary options. Binary options, whatever their definition, have become the focus of various regulatory agencies not just in the United States, but abroad.

Many others sued by the SEC and CFTC for fraud in connection with binary options have settled their cases because the disputed marketing campaigns unarguably show unsavory representations that approach the domain of fraud. But these representations, no matter how unsavory, can never serve as a basis for judgment under the counts brought by the SEC in this case. The applicable regulations were never meant to bring all types of fraud within the domain of the SEC and to characterize Montano's actions as such now would be to impermissibly extend the SEC's jurisdiction.

Even more problematic, the SEC's case as shown in its Motion is entirely predicated upon hearsay and inferences supposed to arise due to Montano's invocation of Fifth Amendment rights and alleged spoliation. This is not a solid case built on evidence, testimony, and reason: it is a house of cards that falls when just a single pillar is blown away. Worst of all? The SEC totally

fails to show any summary judgment evidence that binary options are even involved in this case. For example, the SEC fails to adduce any evidence of the following:

- Any marketed trading software in fact permitted binary options trading;

- That any featured binary options on any trading software were in fact binary options as opposed to fictitious arbitrarily labeled things that could be bought using money, any different than rote gambling; or

- That any alleged binary options referenced securities in any way.

As this Court will see, *infra*, each of these failures matters. Without the evidence for their claims, the SEC could pin anyone against the wall for securities fraud without actually showing how it is related to its jurisdiction. And this test case for the SEC will set precedent. Sure, it may be *difficult* to find the evidence of those things, and, sure, the discovery deadline might have snuck up on the SEC, but that is the burden of a regulatory agency and the agency cannot simply wash its hands of the burden. The power to levy hundreds of millions of dollars of non-dischargeable fines requires that this burden be surmounted.

It has not been.

**II.    SUMMARY JUDGMENT LEGAL STANDARD**

The summary judgment standard described in the Motion is correct as announced in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), namely, that once a movant establishes that there is no genuine issues of material fact, the opposing party must come forward with facts showing that there is a need for a trial. *Id.* at 586-87. But a moving party must discharge the burden of showing that there is no dispute of material fact *before* the burden shifts to the non-movant to "designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

And that is as far as the SEC's standard of review memo goes.

The SEC claims that the Court "may infer that the evidence Montano destroyed and Montano's own testimony would not have been favorable to him." [D.E. 99, p. 12]. It cites to *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1261-62, 1268 (S.D. Fla. 2011) ("*Monterosso I*"), aff'd 756 F.3d 1326 (11th Cir. 2014) ("*Monterosso II*") and *SEC v. Goble*, 682 F.3d 934, 947-48 (11th Cir. 2012) for its proposition. None of these is appropriate for the instant case.

As a first matter, merely invoking the privilege against self-incrimination in a civil case is insufficient for a court to generate adverse inferences. *Baxter v. Palmigiano*, 425 U.S. 308, 317-18 (1976). Another way of saying it is that courts may not draw adverse inferences if it is the sole basis for a plaintiff's case or would cause automatic entry of summary judgment. *F.T.C. v. Transnet Wireless Corp.*, 506 F.Supp.2d 1247, 1252 (S.D. Fla. 2007). Whatever the case, the inference can only be drawn when a party invokes the privilege "in response to probative evidence offered against them." *Baxter*, 425 U.S. at 318. Thus, for each evidentiary proposition that the SEC wishes to get an adverse inference against Montano for, it must do more than claim that Montano refused to answer a question on the subject. This is doubly so when Montano spent two days giving investigative testimony under oath, regarding exactly the same subject matter, and most of the same questions. The result is that the SEC is not prejudiced by Montano's invocation. But even when adverse inferences are issued, our courts are loathe to grant summary judgment based on them. *Pellegrino v. Wengert*, 2016 WL 3690047, at *6 (S.D. Fla. July 12, 2016), aff'd, 703 Fed. Appx. 892 (11th Cir. 2017). This is partially because the probative value and risk of prejudice have to be addressed on an inference-by-inference basis. *SEC v. Calmes*, 2010 WL 11505260, at *4 (S.D. Fla. Nov. 19, 2010).

The SEC's argument that Montano should have adverse inferences drawn against him due to spoliation is similarly lacking in legal merit, but in fact as well. Generally speaking, spoliation is the intentional destruction of evidence. *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003). But federal courts must look to state law principles regarding spoliation for sanctions. *Southeastern Mechanical Services, Inc. v. Brody*, 657 F.Supp.2d 1293, 1299 (M.D. Fla. 2009). "Under Florida law, spoliation is established when the party seeking sanctions proves that: (1) evidence existed at one time, (2) the alleged spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the movant's *prima facie* case." *Id.* citing *Golden Yachts, Inc. v. Hall*, 920 So. 2d 777, 781 (Fla. 4th DCA 2006).

No sanctions can be available and no adverse inference drawn upon the facts in this case. Montano deleted electronic information related to the relevant marketing campaigns in this case before his investigative deposition with the SEC and CFTC and before any litigation from them was contemplated.[2] Indeed, he was and remains under the ambit of a case from the FTC, and as he testified, he did not delete any information related to the FTC lawsuit against him.[3] This is partially because he received an information preservation letter prior to his halting the activities subject to the FTC lawsuit.[4] Neither the SEC nor CFTC succeeded in doing the same in a timely manner.[5] He has not acted in bad faith and no facts support a finding of spoliation, certainly not one sufficient to warrant sanctions.

As a result, the Motion should be decided—and denied—solely based on the facts and nothing but the facts.

---

[2] Deposition of Ronald Montano attached as Exhibit A at 26:17-27:10. The date of the deposition was March 7, 2018, the lawsuit was filed 6 months later, and Montano deleted the information back in 2016. See: Exhibit A at 33:4-19. Regrettably, while Montano is aware of the Court's preference for a full-sized transcript, Montano only has possession of the mini.
[3] *Id.* at 68:22-69:4.
[4] *Id.* 69:1-21.
[5] *Id.* at 69:22-70:5.

**III.    THE MOTION SHOULD BE DENIED**

   **A.    Disputed Material Facts**

   *Generally.*

- The SEC cites to *SEC v. Banc de Binary LTD.*, 964 F. Supp. 2d 1229 (D. Nev. 2013) for a definition of what a binary option is, but there has been no cited record evidence of what a binary option is for summary judgment purposes, nor judicial notice of what it is. There has not been any citation from a fact or expert witness as to whether the alleged binary options from the software Montano helped market were even binary options at all. Expert testimony is crucial here, but the Court has been deprived of it. The vast disparity in definitions of binary options between *Caiola v. Citibank, N.A., New York*, 295 F.3d 312 (2d Cir. 2002) and *banc de Binary*, for example, show the need for a witness able to explain these binary options, and why none of the facts underlying the respective courts' decisions are present in the summary judgment evidence here. "Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case…." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

   *RE: Fact Section I.A.1. of SEC MSJ*

- The SEC claims that "Montano wrote, edited, and approved scripts, generated storylines, decided the settings and backgrounds…" for marketing campaigns, citing Bill Berry's Declaration and the Mike Wright investigative testimony. But that is not all exactly right. First, Wright actually states that he only *assumes* Montano wrote scripts.[6] That is because they never discussed the matter.[7] Rather, Montano would deliver ready-made scripts developed by others

---

[6] Deposition of Mike Wright attached as Exhibit B at 117:6-8.
[7] *Id.* at 117:10-11.

6

when he was directly involved.[8] Additionally, Wright states that he himself wrote some of the binary options marketing scripts.[9] The SEC has not bothered to distinguish between them for the Court in its MSJ. Additionally, Montano himself told the SEC that his process involved hiring a copywriter for the scripts.[10] This makes sense since, as the SEC itself notes, Montano hired a copywriter to draft the email swipe portion of the campaigns.[11]

- The SEC claims that Montano developed emails using fictitious sender names to make it appear they came from the person or company inventing the software, citing its screenshots in Exhibit C and the Stephenson Declaration, referring specifically to Larry's Cash Machine. But Larry's Cash Machine **is not** a campaign developed by Ronnie Montano[12], no matter how many times the agencies claim it, and Exhibit C is inadmissible hearsay. The Larry's Cash Machine ("LCM") example is important as it is used repeatedly by the agencies. Bill Berry, who produced the video for LCM, states without hesitation or doubt that Travis Stephenson was in complete control of LCM and hired Berry to create the video.[13] Montano himself agrees with Berry.[14]

- The story with Centument is similar. The SEC repeatedly refers to, claims, and implies that Montano created the content for the Centument campaign. He did not.[15] The same was true of Binary Hijack.[16]

   *RE: Fact Section I.A.2. of SEC MSJ*

---

[8] Exhibit A at 702:17-703:20.
[9] Exhibit B at 116:10-16. See also: Declaration of Mike Wright, attached as Exhibit C, at nos. 9, 10, 11.
[10] Exhibit A at 103:1-12; 131:2-15; 135:9-19. The SEC and CFTC attorneys spent an inordinate amount of time repeating questions to Montano about who wrote the marketing material. Montano consistently explained the process, which contradicts the SEC's extremely material fact about who made the misrepresentations.
[11] *Id.* at 234.
[12] Declaration of Bill Berry attached as Exhibit D at nos. 8, 11; Exhibit A at 295:23-296:2; 224:5-14.
[13] Declaration of Bill Berry Certifying Video Tapes attached as Exhibit E at no. E.
[14] Exhibit A at 212:4-22; 698:1-24.
[15] *Id.* at 608:6-18.
[16] *Id.* at 687:16-20.

- In one breath, the SEC claims states that Montano destroyed his payment records for binary options deposit commissions "although it was not his regular practice to do so," and then cites to his testimony wherein he claims it was indeed his regular practice.[17] That is a dispute of material fact.

- The SEC seems to imply that Montano had some of his binary option deposit commissions paid to Martin Schranz, citing several sources. *None* of those sources, most especially Martin Schranz himself, claim that those are binary option deposit commissions.[18] To the contrary, Schranz claims that any monies he ever held on behalf of Montano were related to non-binary options marketing.[19]

- Importantly, the SEC claims Montano has received millions of dollars in commissions from binary options deposits (not trading; there has never been any allegation Montano made money from trades). But there is no evidence of this at all. As the SEC knows, Montano made money from similar transactions under FTC jurisdiction.[20] Those monies were paid to the same bank accounts as accounts that received binary options related deposits.[21] Those accounts received the monies from Clicksure and Clickbetter.[22] Inexplicably, the SEC investigator claims those monies are actually from *binary options* related transactions. There is no foundation for this.

### RE: Fact Section II

- The SEC claims that the brokers listed by Israeli websites "allowed investors to 'bet' on the prices of both securities and commodities. For this proposition, the SEC merely grabs some screenshots from the Internet Archive a/k/a Wayback Machine and asks that the Court use the

---

[17] *Id.* at. 24:20-25.
[18] Deposition of Martin Schranz attached as Exhibit F at 68:3-24.
[19] *Id.* at 68:22-69:19; 70:8-71:9.
[20] *Id.*
[21] *Id.*
[22] *Id.* at Exhibits 14, 15 among many others.

magic wand of judicial notice to somehow make their claim true. Judicial notice of screenshots is not an issue. That is permitted all the time. But there is no amount of judicial notice that can prove the SEC's claim. There is no evidence that BOA or Boost ever allowed that. There is no evidence that the trading software permitted it. There is no evidence that any such binary options relating to securities or commodities existed at all. There are no screenshots of such options. No screenshots of any being traded. It is like proposing that this Court take the following photo as evidence that a store had free toys:



For starters, the SEC is asking that the Court believe the words on a webpage run by people the SEC believes commit fraud on a regular basis. That is a bit of a contradiction. Second, the SEC is asking the Court to use judicial notice for a proposition it absolutely cannot be used for: hearsay. *Galvan v. City of La Habra*, 2014 WL 1370747, at *2 (C.D. Cal. 2014) ("'Judicial notice, while it may cure authentication, does not cure any customary objections involved in the admissibility of evidence, such as… hearsay.'"). Whether or not something is a security is based on substance, not form. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848 (1975). Yet all the SEC has offered is form, not one ounce of substance.

    **B.**    **Applying the Disputed Material Facts**

  **1.** *Montano did not violate § 10(b), Rule 10b-5 of the Exchange Act or § 17(a) of the Securities Act*

  a. <u>The Big Picture</u>

It is an inescapable reality of the litigation posture in this case that the SEC has failed to produce any summary judgment evidence that would show there was any sale or purchase of securities. This is an element that *must* be proved for a 10(b) violation. 17 C.F.R. 240.10b-5. It is also an element of a § 17(a) violation, but if the violation is based on a misrepresentation, then the SEC must also show that Montano received money or property as a result. 15 U.S.C. § 77q(a)(2). Again, there is no summary judgment evidence that Montano received money or property as a result of those activities. There is no expert testimony to explain how any of the potential binary options traded or offered on the trading software were tied to securities *in any way*. There is no explanation for how the software worked. And there is absolutely no tracing job done whatsoever of if the monies received by Montano from entities like Clicksure and Clickbetter derive from the campaigns subject to SEC scrutiny. All the SEC can claim is Clicksure and Clickbetter delivered proceeds to Montano—but they did so for campaigns subject to FTC jurisdiction mostly, and perhaps also for campaigns subject to CFTC jurisdiction, and perhaps those not subject to any jurisdiction (there is no evidence that the traders did anything different than show up to a slot machine and pull the lever). That is <u>not</u> good enough. *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (holding that the SEC's claims for $300 million in disgorgement have no evidentiary basis, and that the record only supported an award of $21 million).

  Just as importantly, according to the SEC's summary judgment evidence, multiple campaigns would be beyond the five (5) year enforcement period per 28 U.S.C. § 2462. For example, the video for Mobile Binary Code was delivered to Montano on April 12, 2013 and the

video for Auto Binary Code / Binary Cash Code was delivered on June 14, 2013.[23] This leaves, at best, 18 campaigns for which Montano even arguably acted as an affiliate, though not one involving any securities.

          b.        <u>No Deceptive Acts or Misrepresentations</u>

Even allowing that somehow the SEC meets its threshold burden of providing evidence that securities are at issue, it is fatal to the SEC's Motion that there is a dispute of material fact regarding Montano ever creating statements, let alone fraudulent statements, for the Larry's Cash Machine, Centument, and Binary Hijack campaigns. Indeed, these are the only three campaigns the SEC cited transcripts from, and from which the SEC makes its case in the Motion. The SEC must show that Montano *caused* the misstatements or omissions to be made and knew the statements were calculated to reach investors. *S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1268 (S.D. Fla. 2011), *aff'd*, 756 F.3d 1326 (11th Cir. 2014). But Montano was a marketing professional being asked to create advertisements for products from two Israeli intermediaries. It is difficult to see how he would be the control person here, not the intermediaries.

          c.        <u>No Connection to Offer or Sale of Securities</u>

The SEC claims that the "in connection" element of a 10b-5 violation is established when a party makes representations about specific third-party investments citing *SEC v. Hui Feng*, 2017 WL 6551107, *10 (C.D. Cal. Aug. 10, 2017). But no such representations were made by Montano and no evidence suggests they were. The SEC also suggests that newsletters presenting opinions about specific securities satisfies the element of the crime, citing *SEC v. Nofstra Energy, Inc.*, 202 F. Supp. 3d 391, 397-98 (S.D.N.Y. 2016). But in that case, too, the opinions were about *specific* securities, not about an industry, i.e. the *glory* of binary options or, it might as well have been, the

---

[23] <u>Exhibit D</u> at no. 8.

11

advantages of stock trading, generally. What none of these cases can do is help this Court make the fundamental leap it must make for a 10b-5 judgment: what did Montano do that was deceptive or misrepresenting in connection with the offer or sale of securities? He got paid on deposits, not trades, and never made representations about securities—he couldn't, as he did not know anything about them.

d. No Offer and Sale of Securities

An even bigger chasm for the SEC to cover is the allegation that Montano in fact offered securities for sale. The SEC offers several guidelines from the SEC, but certainly no case law on point for the subject. Its interpretation of these materials is that someone who conditions the public mind or arouses public interest in an "issuer or its securities constitutes an offer." And yet no summary judgment exists regarding who the issuers are, or if interest was generated in them, or how or if securities were ever offered by the Israeli intermediaries and their brokers. Even if the SEC could have done such a thing, however, there is no action taken by Montano that fits the plain text of this regulatory bill.

2. *Montano did not violate § 20(b) of the Exchange Act*

A genuine issue of material fact exists regarding whether or not Montano violated the Exchange Act at all, let alone through any person, since neither the affiliates nor sub-affiliates, as far as we know from summary judgment evidence, dealt with securities or options referring to the value of any securities. There is a genuine issue of fact as to whether or not Montano knew any of the representations that went to sub-affiliates were misleading. This prevents summary judgment. *SEC v. Wyly*, 950 F. Supp. 2d 547, 563 (S.D.N.Y. 2013).

3. *Montano did not aid and abet Travis Stephens*

As with the previous claims, summary judgment is unavailable because one of the elements is that an underlying securities violation occurred. There is no summary judgment evidence about securities or financial instruments based on securities in any way. But there is also a summary judgment issue as to whether or not Montano knew or recklessly assisted Stephenson because Montano never realized the products or campaigns might be fraudulent. If this Court held otherwise based on the summary judgment evidence, then any marketer is toast.

### 4.    *Montano did not violate § 5 of the Securities Act*

The SEC's entire argument in this section of the Motion is based on inadmissible hearsay. It has no idea what binary options were offered by the brokers or through intermediaries, much less any offered on trading software that came from the disputed marketing campaigns. The SEC has no idea if securities or commodities were offered by these entities, nor if financial instruments *based* on securities or commodities were offered. No proffer has been made, no adequate judicial notice suggested, and no other form of summary judgment evidence exists for its propositions. As a result, it could not know whether or not any registration statement had been made or would have been applicable. From a summary judgment perspective, the SEC has shown that persons clicking Montano's marketing were just as likely to end up depositing money to play a virtual slot machine as trade binary options. And that's the problem with the SEC's entire summary judgment case.

### C.    The First and Fifth Amendments Bar Summary Judgment

### 1.    *Generally*

Montano elaborates two constitutional arguments in his own motion for summary judgment filed in this case [D.E. 111]. Each of them individually precludes summary judgment in favor of the SEC. Together, they conclusively prevent the SEC's actions. Those arguments are

incorporated by reference for the sake of meeting page restriction limits of Local Rule 3.01, but are summarized here.

### 2. *The First Amendment*

The laws brought to bear by the SEC should not be enforced against Montano because they violate his rights under the First Amendment. Since about 1976, the First Amendment has been understood to protect even speech for which money is spent to project it or arising from paid advertising—including speech that involves a solicitation to purchase or to pay or contribute money. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976). In 1978, rising from the nadir of constitutional protection for commercial-related speech, the Supreme Court recognized in *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) that commercial speech is entitled to constitutional protection.

To the extent that advertising and promotions are *informational*, they are protected by the First Amendment. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). But "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public…. The government may ban forms of communication more likely to deceive the public than to inform it…." *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 563 (1980).

In this case, we have no summary judgment evidence that the public was more likely to deceive the public than to inform it. We have no summary judgment evidence related to how the software works, how often it works or leads to profit for its traders, or otherwise. There is no expert testimony regarding results. But even if we did, the better course for this Court to follow would be to recognize Montano's First Amendment rights as a marketing professional. In recent years, the scope of First Amendment protection for commercial-related speech has widened considerably. In

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001), despite concerns about the well-established links between tobacco smoking and health maladies, the Supreme Court found that the reasonable fit between the means and ends of the applicable regulatory scheme did not exist due to the burdens on First Amendment speech. *Id.* at 561. Just so, here. It is hard to understand how the SEC's characterization of an offer or sale could or should be applied to those marketing an *industry* (online trading) or a *software* (whatever software was subject to a particular campaign) as opposed to those regarding specific securities-based transactions and/or swaps and swap agreements.

Consider, also, this landmark expansion of First Amendment rights contained in *Citizens United v. FEC*:

> Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Id.* at 558 U.S. 310, 340-41 (2010).

With no summary judgment evidence of the results, or showing the software was akin to gambling, or any type of actual investment tool, the ambit of First Amendment protection should loom much larger.

### 3. The Fifth Amendment

First, all of the laws that the SEC has sued Montano under are unconstitutionally vague as applied to Montano. None of the summary judgment evidence, and certainly none of the inadmissible screenshot hearsay, stands for the proposition that securities or securities-based swaps are at issue in this case. And if there is never an offer or sale of any securities, including

security-based swaps, then the SEC is attempting to apply statutes far beyond anything that a reasonable marketer would have notice of as applying to the marketer's behavior.

All of the laws that the SEC charges against Montano may also be criminal in nature by way of 15 U.S.C. §§ 77x, 78ff. The Due Process clause of the Fifth Amendment, that "no person… shall be deprived of life, liberty, or property, without due process of law" requires that notice of proscribed conduct be given to the potential offender of an offense. *United States v. Harriss*, 347 U.S. 612, 617 (1954). In this context, "Congress must ensure that a criminal law not only 'provide[s] the kind of notice that will enable ordinary people to understand what conduct it prohibits' but also that it does not authorize or 'even encourage arbitrary and discriminatory enforcement.'" *U.S. v. Di Pietro*, 615 F.3d 1369, 1371 (11th Cir. 2010) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).

The SEC does not allege and certainly has no proof that Montano offered any securities or swap agreements, or was offering their sale. Montano helped develop videos, usually hired a copywriter to develop the script or took one ready-made from higher up, and had no idea how binary options actually functioned.[24] His sole incentive in developing marketing materials—and he was only a marketer—was to receive commissions from deposits that people made in trading accounts.[25] He would receive this money regardless of whether or not anyone ever traded.[26] The law does not make sense as applied by the SEC here.

The second concern with this Fifth Amendment violation is that it must not permit arbitrary and discriminatory enforcement. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982). The principal element helping agencies get past this concern is the requirement that a legislature

---

[24] Exhibit A at 108:2-7.
[25] *Id.* at 182:22-25-183:1-13; 184:1-12; 285:1-9.
[26] *Id.*

establish minimal guidelines to govern law enforcement. *Smith v Goguen*, 415 U.S. 566, 574 (1974). Where there is no guideline, such statutes may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). All of the SEC's counts fail to pass constitutional muster under the Fifth Amendment especially given that the SEC's only attempt to show binary options were implicated in the marketing campaigns come from inadmissible screenshots.

### D. The SEC Fails to Address or Surmount Montano's Affirmative Defenses

Unlike the CFTC, the SEC makes no attempt to address Montano's affirmative defenses. However, summary judgment is only possible if the SEC surmounts them. It does not.

## IV. ALTERNATIVELY, SUMMARY JUDGMENT RELIEF SHOULD BE LIMITED

### A. Relief Should Be Limited Based on Territoriality

The SEC stands before this Court with a motion for summary judgment not having any idea who the alleged victims of Montano's marketing are, where they live, or if they actually made money from the software. For this section's purpose, however, the focus is on territoriality. The SEC has failed to show that the alleged violations can be applied to persons outside the United States. But the SEC has informed the Court of the extraterritoriality of two main "bad" actors, namely BOA and Boost, in Israel. The SEC is just shooting in the dark about the recipients of Montano's marketing and has offered no summary judgment evidence that those persons reside in the United States.

The United States Supreme Court has held in clear terms that the focus of the Exchange Act, and all related enforcement laws, "is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010). The SEC has not even tried to show this. Instead, it has been content to

suggest and even show that the securities, if they exist, were based out of Israel. But that would lead to summary judgment for Montano instantly, if true. *Id.* at 253-54 (holding that extraterritoriality is not a jurisdictional issue but that it rather goes toward the merits). The tortuously reasoned decision in the Tenth Circuit, *SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) is no help. The *Scoville* court engages in a double-time march through legislative history that refuses to engage with the language of the statutory text or *Morrison*'s holding, except to deride it. Unsurprisingly, a petition for writ of certiorari to the United States Supreme Court is pending.[27]

And, to the extent that this Court is satisfied the SEC has provided some evidence that the actions are within its purview, Montano requests that the Court ties the relief to the actions taking place in SEC jurisdiction.

### B.      Relief Should Be Limited Based on Regulatory Jurisdiction

Similarly, the SEC and CFTC are fighting over the same pot of binary options trading software. The CFTC correctly stated its motion for summary judgment, albeit in a footnote, that it sought disgorgement without regard to whether or not the binary options related to commodities. After confessing to wildly waving around its enforcement gun, uncaring as to who it hits, the CFTC suggests that there is a risk of "double-dipping" in terms of disgorgement as a result. There is an old phrase about "where there is smoke, there is fire." The securities litigation version of this is that when the agencies beat the defendant to a point, the Court should be worried.

As a result, if this Court does consider awarding summary judgment, then Montano requests that the Court only do so to the extent that the SEC has strict proof of securities-based transactions existing.

---

[27] The brief of securities law scholars as *amici curiae* is instructive:
https://www.supremecourt.gov/DocketPDF/18/18-1566/108835/20190722140839583_Brief_of_Amici_Curiae_in_support_of_Petitioner.pdf

## V.     CONCLUSION

An old *voir dire* trick for teaching juries about the elements of a crime is to ask them to consider the elements of a peanut butter and jelly sandwich. The trial lawyer suggests to the prospective jurors that you need three elements: bread, peanut butter, and jelly. When proving that a peanut butter and jelly sandwich is made, a party would need to prove that all three of those elements existed.

But now let us imagine that it is a crime to put any other ingredient besides jelly along with peanut butter between those slices of bread. And let us further imagine that a Sandwich Exchange Commission, charged with regulating the integrity of sandwich markets, seeks to prove that a nefarious defendant instead made a sandwich with butter instead of jelly. When the SEC moves for summary judgment, it provides evidence in the form of testimony and admissions that bread and peanut butter were used. But when it comes to the butter, the Sandwich Exchange Commission only offers a receipt from defendant's trash that appears to show a kind of butter was purchased from Publix mere days before the sandwich in question was made. The receipt would be hearsay, hardly be the kind of evidence upon which to base a major securities litigation precedent.

The same is true here. There is no summary judgment evidence of any securities being traded, referenced, or securities-based swaps. The Motion failed to follow even Local Rule 3.01(h). The SEC has failed to meticulously provide the case that this Court needs to award summary judgment. Summary judgment is "a lethal weapon, depriving a litigant of a trial on the issue…." *Tippens v. Celotex Corp.*, 805 F. 2d 949, 952 (11th Cir. 1986). It is a weapon that cannot just be carelessly waved around.

The SEC's summary judgment case amounts to the presentation of some videos, undisputed evidence that Montano had involvement with *some* of the videos, and a wing and a

prayer that this Court will let slide a bounty of inadmissible hearsay and testimony from compromised and non-credible witnesses to make the leap from allegation to undisputed proof. It is not enough. None of the hearsay evidence presented by the SEC, so crucial to its case regarding the actual nature of the binary options, is admissible. *Macuba v. Deboer*, 193 F.3d 1316, 1324 (11th Cir. 1999) (holding that, at the very least, hearsay must be in a form that could be admissible at trial). Montano's MSJs offer the stronger arguments and a better interpretation of the summary judgment evidence.

**WHEREFORE**, Montano respectfully requests that this Court deny the Motion [D.E. 99].

Respectfully Submitted,

/s/ Christian W. Waugh
Christian W. Waugh
Florida Bar No. 71093
Morgan Fayocavitz
Florida Bar No. 1015835
Email: cwaugh@waughpa.com
Email: mfayocavitz@waughpa.com
Email: rwood@waughpa.com
WAUGH LAW, P.A.
321 N. Crystal Lake Drive, Ste. 207
Orlando, FL 32803
Telephone:  321-800-6008
Fax:   844-206-0245

*Attorneys for Ronald Montano*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and that all counsel of record participating in CM/ECF were served a copy.

By:    /s/ Christian W. Waugh
       CHRISTIAN W. WAUGH