UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>RONALD C. MONTANO, TRAVIS STEPHENSON, ANTONIO GIACCA and MICHAEL WRIGHT,<br><br>    Defendants; and<br><br>DENISE MONTANO, ROMEO MONTANO, ELMA MONTANO, AND REM FLORIDA PROPERTIES, LLC,<br><br>    Relief Defendants. | Case No. 6:18-cv-01606-GAP-GJK |

**PLAINTIFF'S
REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANT RONALD C. MONTANO**

    In support of its Motion for Partial Summary Judgment against Defendant Ronald C. Montano ("Montano"), Plaintiff, the Securities and Exchange Commission ("SEC"), submits this Reply Memorandum. Because the issues have already been extensively briefed, to avoid repeating arguments already made, the SEC will seek to confine its memorandum to new issues raised in Montano's Opposition.

**ARGUMENT**

    The SEC has submitted evidence of the fraudulent content of fourteen binary options campaigns along with evidence that Montano was responsible for disseminating that content to his own email list (as an Affiliate and a Sub-Affiliate) and to the email lists of other marketers (by engaging them as Sub-Affiliates for his campaigns). Attached as **Exhibit P** is a table identifying

the SEC's evidence of the content of fourteen campaigns, as well as evidence showing Montano's role in disseminating them.[1] The same evidence establishes that Montano committed securities fraud through others, aided and abetted securities fraud committed by Travis Stephens, and offered or solicited the sale of unregistered securities. Montano attacks this evidence on numerous grounds, none of which are well-founded.

I.  **The Evidence against Montano is not Inadmissible Hearsay.**

Montano claims that all of the evidence against him is hearsay, which is incorrect. Most of the evidence regarding the fourteen campaigns comes from declarations, which are specifically authorized under Fed. R. Civ. P. 56(c)(4). One declaration is of videographer William Berry, who identified binary options campaign videos Montano hired him to create, stated that the persons depicted as real in the videos were actors he hired, that the luxury items shown in the videos were rented, that Montano provided him with screenshots of Montano's bank account to use as "proof" of the wealth obtained by users through the software, and that Berry had created a fictitious binary options account to use in a Montano video. Berry Dec. at ¶¶8, 9, 19, 35. *See also* **Ex. P**. Two additional declarations are from fellow binary options marketers Travis Stephens and Grayson Brookshire, both of whom identified their own binary options campaigns for which Montano served as a Sub-Affiliate, as well as binary options campaigns they disseminated for Montano. Stephens Dec. at ¶¶17-36; Brookshire Dec. at ¶¶11 and 14. *See also* **Ex. P**. Nowhere does Montano claim or provide evidence that these declarants are incompetent or lack personal

---

[1] In fact, as pointed out in the CFTC's Memorandum, Montano admitted launching 21 binary options campaigns and there is evidence that, altogether, Montano was involved in disseminating 35 binary options campaigns. *See* Docket No. 90 at 4-5 in *CFTC v. Montano,* Case No. 6:18-cv-01607-GAP-GJK (Nov. 21, 2019).

2

knowledge, or that the facts included in the declarations would be inadmissible at trial. *See* Fed. R. Civ. Rule 56(c)(4) (identifying grounds for objection to declarations).

Other evidence of the fourteen campaigns are emails and chats from Montano to Sub-Affiliates announcing the launch of his campaigns, the "leaderboard" standings for prizes Montano offered to the top Sub-Affiliates who disseminated his campaigns, or the results of his participation in the campaigns of other marketers. *See* **Ex. P**. These statements are not hearsay because they are statements by Montano, the SEC's opponent, offered against Montano, the SEC's opponent. *See* Rule 801(d)(2) (opposing party's statement is not hearsay when offered against opponent).[2]

Other evidence of the fourteen campaigns are campaign web pages, video scripts, email swipes and videos that establish the fraudulent content of the campaigns. *See* **Ex. P**. None of these materials are hearsay because they are not offered to prove that misrepresentations were true, but as evidence of the fraud itself. *See* Rule 801(c)(2) (hearsay is an out of court statement offered "to prove the truth of the matter asserted in the statement"); *see also U.S. v. Williams,* 865 F.3d 1328, 1343 (11th Cir. 2017) (a statement is not hearsay when offered to show the statement is false).

Evidence of the fourteen campaigns includes invoices from Michael Wright for the Azure, Centument, and Mobile Binary Code campaigns. **Ex. Q** (Invoices from Michael Wright). These invoices are not hearsay because the testimony of Michael Wright, the person who created them, establishes the foundation for the business record exception to the hearsay rule, and Wright

---

[2] Some of the emails and chats announcing the launch or leaderboard for Montano's campaigns were sent from Martin Schranz, whom Montano held out as his "partner." Berry Dec. at ¶22. Schranz testified that he authorized Montano to send chats and emails about binary options marketing under Schranz's name. **Ex. R** (Martin Schranz Deposition Testimony) at 77-90.

3

testified that Montano hired him to create email swipes for these campaigns. **Ex. S** (Add'l Pages from Wright Inv. Test. Tr.) at 70-72, 200 (Wright's standard practice regarding invoice creation). Moreover, these the fact that Montano paid for Wright to create these swipes is not in dispute as both Montano and Wright testified that he did so. *Id.* at 154-56, 212-13 and 214; **Ex. T** (Add'l Pages from Montano Inv. Test. Tr.) at 538 and 686.

Finally, evidence of the fourteen campaigns includes emails from fellow binary options marketer Brookshire, announcing that Montano had won a prize for disseminating Brookshire's Stark Trading System campaign and an email from binary options marketer Tim Atkinson, announcing that Montano had won a prize for disseminating Atkinson's Cash Code campaign. *See* **Ex. P**. While these documents are hearsay, they fall within the residual exception to the hearsay rule which admits hearsay statements supported by sufficient guarantees of trustworthiness due to the circumstances in which the statements were made and other corroborating evidence. Fed. R Evid. 807(a).

Here, both statements are against the pecuniary interests of the declarants, who were responsible for providing the prizes. Statements against pecuniary interest have long been recognized as providing circumstantial guaranties of reliability. *See* Fed. R. Civ. P. 804(b)(3)(A) (hearsay statements contrary to the declarant's pecuniary interest are admissible). Moreover, the documents are corroborated by other evidence including the declaration of Brookshire that Montano won a prize for Brookshire's Stark Trading Campaign, and Montano's own testimony

that he won a prize for Atkinson's Cash Code campaign. Add'l Pages from Montano Inv. Test. Tr. at 666-69.[3]

## II. The SEC Need not Prove that Montano Made Misrepresentations or Obtained Money through Misrepresentations to Establish Montano's Liability for Securities Fraud although these Facts are not Disputable.

As previously pointed out, there are two alternate methods for proving fraud under Section 10(b) and Section 17(a) – one method is through proof of deceptive conduct;[4] the second method is through proof of a material misrepresentation.[5] A misrepresentation under Section 10(b) must be made by the defendant; under Section 17(a), the defendant need not have made the misrepresentation, but must have obtained money or property as a result of it.[6]

Montano claims that because he purportedly did not develop some campaigns, or hired a screen writer for some campaigns, or did not control the content of some campaigns, or was provided marketing material by others, he cannot be liable for their content. These purported facts are only relevant with respect to whether Montano meets the definition of the "maker" of a misrepresentation under Section 10(b)(2). This evidence has no bearing on whether Montano engaged in deceptive conduct. *SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 796-97 (11th Cir. 2015) (the term "make" appears only in Rule 10b-5(b) and is not a requirement of claims based on deceptive conduct under either Section 10(b) or Section 17(a)). Similarly, Montano

---

[3] Montano claims that all of the evidence against him is based upon an inference arising from the invocation of his Fifth Amendment right against self-incrimination or his destruction of evidence and, also, that the SEC's evidence is limited to three campaigns. The recitation in Exhibit P demonstrates that Montano's claim is simply not accurate.

[4] The elements of a Section 10(b) claim are contained in Rule 10b-5. Rule 10b-5(1) and (3) describe fraud by deceptive conduct. *See* 17 C.F.R. 240.10b-5(1) and (3). The equivalent provisions under Section 17(a) are 17(a)(1) and 17(a)(3). *See* 15 U.S.C. 77q(a)(1) and (3).

[5] *See* Rule 10b-5(2) [17 C.F.R. 240.10b-5(2)] and Section 17(a)(2) [15 U.S.C. 77q(a)(2)].

[6] *Compare* 240.10b-5(b) *with* 15 U.S.C. 77q(a)(2).

argues that there is no evidence that the $6 million in funds he received during the time period he was marketing binary options constitutes commissions or prizes for binary options campaigns, an argument that only relates to whether Montano obtained money through his misrepresentations.

The SEC has submitted ample evidence that Montano committed securities fraud through deceptive acts by engaging in bait-and-switch marketing campaigns, falsifying documents to prove purported profits obtained through use of the software, presenting fake testimonials, and disseminating misrepresentations made by others. *See* **Ex. P**. The Court need not find that Montano also committed securities fraud by making misrepresentations or obtaining money through misrepresentations to enter summary judgment against Montano on the SEC's security fraud claims.

While the Court need not reach the issue of Montano's direct liability for misrepresentations under Rule 10b-5(b) or Section 17(a)(2), there is ample evidence from which the Court could do so. A person is a "maker" of a misrepresentation where he has "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders,* 564 U. S. 135, 142 (2011). A defendant who solicits a misrepresentation from a third party, and then uses the misrepresentation to further a fraudulent scheme, is a "maker" of the misrepresentation as contemplated by *Janus. SEC v. Garber*, 959 F. Supp. 2d 374, 380-82 (S.D.N.Y. 2013). As the *Garber* court explained in rejecting a similar argument by defendants who had disseminated a deceptive opinion from their attorney to facilitate their sale of unregistered securities, the issuance of the deceptive opinion "did not further the scheme, it was only when Defendants presented the information in support of their ability to sell the penny stocks without registration that they had the intended effect. Even under *Janus*, the 'making' of these statements could be attributed to Defendants." *Id.* In his own

Opposition, Montano admits this is precisely what he did. Opp. at 2 (Montano accepted information from foreign entities for his campaigns which "unarguably show unsavory representations that approach the domain of fraud.")

The record also supports a finding that Montano made over $6 million in commissions through binary options marketing. Montano refused to answer the SEC's interrogatories seeking to elicit how much of his income between 2013 and 2016 was derived from the marketing of binary options, as opposed to other activities, on the grounds that it might incriminate him and also refused to disclose his bank account numbers. *See* **Ex. U** (Montano Amended Responses to SEC's Interrogatories). Under these circumstances, the Court is entitled to infer that, had Montano provided evidence as to the source of the $6 million in funds, the evidence would have revealed the funds were commissions from binary options campaigns.

### III.  No Expert Testimony on the Definition of "Security" is Required.

Montano argues that whether a binary option tied to a security meets the definition of "security" requires expert testimony. However, whether a particular investment falls within the statutory definition of a security is a question of law for the court. *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 754 (11th Cir. 2007). As expert opinion is only permitted to assist the "trier of fact," Fed. R. Evid. 702(a), no expert testimony is required, or indeed, permitted, here.

### IV.  Evidence of an Actual Purchase or Sale of Binary Options tied to Securities is not Required.

Montano continues to argue that he cannot be liable for securities fraud, or the sale of unregistered securities, absent proof that an investor engaged in a securities transaction based upon a campaign Montano disseminated. The SEC will not repeat its detailed explanation as to why Montano is wrong here, other than to state that:

- Section 17(a) does not require proof of any securities transaction because, by its express terms, Section 17(a) reaches "the offer" of securities. 15 U.S.C. 77q(a);

- Section 10(b)'s "in connection with the purchase or sale," requirement is broadly interpreted so that, "[i]n some instances a § 10(b) fraud may occur even without an actual purchase or sale of securities," such as where material misrepresentations "were disseminated to the public in a medium upon which a reasonable investor would rely." 17 C.F.R. 240.10b-5; *SEC v. Merkin,* No. 11-23585-CIV, 2012 WL 5245561, *4, *8 (S.D. Fla. Oct. 3, 2012) (citation omitted);

- Section 5(c) of the Securities Act does not require proof of any securities transaction because, by its express terms, Section 5(c) makes it unlawful for any person, directly or indirectly, "to offer" unregistered securities. 15 U.S.C. § 77e(c);

- Section 5(a) of the Securities Act, which makes it unlawful for any person, directly or indirectly, "to sell" an unregistered security, is broadly interpreted to reach the solicitation of a sale. 15 U.S.C. § 77e(a); *Pinter v. Dahl,* 486 U.S. 622 (U.S. 1988).

In furtherance of his claim that an actual purchase and sale of a security should be required, Montano theorizes that, perhaps the binary options brokers to whom investors were referred did not provide investors with binary options tied to securities as advertised, but instead offered some "fictitious arbitrarily labeled things" or that investors were "just as likely to end up depositing money to play a virtual slot machine as trade binary options." Opp. at 3, 13. Montano's theory does not strengthen his argument, it refutes it.

As many courts have recognized, "it is the representations made by the promoters . . . that determine whether an interest is an investment contract (or other security)" because one of the central purposes of the securities laws is to protect would-be investors in the securities markets

8

against misrepresentations. *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (cited with approval in *SEC v. Unique Financial Concepts, Inc.,* 196 F.3d 1195, 1200 (11th Cir. 1999)). For that reason, the securities laws reach offers and sales of items promoted as securities even if the "security purportedly traded is nonexistent or fictitious [because] [a] contrary result would encourage rather than curb fraud." *Unique Financial Concepts, Inc.,* 196 F.3d at 1200 (citation and internal punctuation omitted). "It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws." *Id.* (citation and internal punctuation omitted). *See also Lauer,* 52 F.3d at 670 (noting that "misrepresenting an interest as a security when it is nothing of the kind" is an "elementary" form of securities fraud).

### V. The Evidence Establishes that Montano Offered a Specific Type of Security Sold by Specific Brokers.

Montano also argues that the marketing materials he disseminated only touted the industry of binary options, not a specific security, without explaining why this would relieve him of liability. In a case involving the Commodity Futures Trading Act's "in connection with" requirement, which is to be interpreted in accordance with the identical language in the Exchange Act, the Eleventh Circuit found that fraudulent marketing for "a specific type of commodities investment" (future contracts) to be traded by a specific broker satisfied the "in connection with" requirement. *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1331-32 (11th Cir. 2002) (reversing judgment for defendant and directing the entry of judgment for the CFTC).

The evidence here is even more compelling. The marketing materials Montano disseminated offered a specific product – software invented by a specific person, group, or company (*e.g.*, Larry the Harvard Professor), that worked a specific way (*e.g.,* "it leverages the intelligence of thousands of traders' decisions"), and that had a specific accuracy rate or track record ("OVER $38,000,000 IN PROFIT"). *See* **Ex. D** (Larry's Cash Machine video); **Ex. C** 146-

9

57 (Stock Matrix Pro Script); *id.* at 46-49 (Binary Hijack Website).[7] The marketing materials told investors that the purpose of the software was to trade binary options tied to securities and commodities. "Every time you lose money in the stock market, you'll know you could have had a machine doing all of your trades with 97 percent accuracy." **Ex. L** at 28 (Larry's Cash Machine Video Transcript). When investors entered their information into a campaign web page, they were not taken to a webpage touting binary options as an industry; investors were transferred to the webpage of one of two specific broker aggregators who, in turn, transferred the investor to one of several specific binary options brokers. Montano Inv. Test. Tr. at 98-100, 148, 238-39; **Ex. F1** and **F2**. The binary options brokers also claimed to offer binary options tied to securities. **Ex. G1-H**.[8] As in *R.J. Fitzgerald,* Montano committed fraud in connection with the offer of a specific type of security (binary options tied to securities) sold by specific brokers.

## CONCLUSION

The SEC's partial summary judgment motion as to Montano's liability should be granted, Montano's summary judgment motion should be denied, and the Court should find Montano liable for the foregoing violations of the securities laws.

---

[7] Some pages of Exhibit C as submitted with the SEC's opening brief are missing page numbers. The SEC has submitted an amended version of Exhibit C with this reply.

[8] Montano's argument that the broker web pages are hearsay should be rejected. Offers to buy are not assertions nor are they offered into evidence for the truth of the matter asserted. *See, e.g., SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 810 (2d Cir. 1975) (verbal telephonic offer to purchase stock made by unknown person was not hearsay); *Octel Communications Corp. v. Theis Research, Inc.,* Nos. C 92–20217 RMW (PVT), C 93–20287 JW (EAI) and C 93–20288 RMW (EA) (N.D. Cal. Sept. 15, 1993) (offer to provide patented technology was not offered for the truth of the matter asserted, but for the operative fact that an offer to sell was made).

Dated: January 6, 2020

Respectfully submitted,

/s/ Samantha M. Williams
MD Bar No. 12190024
Tel: (202) 551-4061
Fax: (202) 772-9292
Email: williamssam@sec.gov
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949

Attorneys for Plaintiff
*Securities and Exchange Commission*

## CERTIFICATE OF SERVICE

I certify that, on January 6, 2020, I served the foregoing paper on all parties via ECF

/s/ Samantha M. Williams
Attorney for Plaintiff