# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**SECURITIES AND EXCHANGE COMMISSION,**

        Plaintiff,

v.                                      Case No:  6:18-cv-1606-Orl-31GJK

**RONALD C. MONTANO, TRAVIS STEPHENSON, ANTONIO GIACCA, & MICHAEL WRIGHT,**

        Defendants.

**ROMEO A. MONTANO, ELMA C. MONTANO, REM FLORIDA PROPERTIES, LLC, and DENISE MONTANO.**

        Relief Defendants.

_____

## REPORT AND RECOMMENDATION

This cause came on for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST RONALD C. MONTANO ON THE ISSUE OF LIABILITY (Doc. No. 99)** |
| **FILED:** | **November 21, 2019** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

# PROCEDURAL HISTORY

On March 11, 2019, Plaintiff Securities and Exchange Commission (the "SEC") filed an Amended Complaint against Defendants Ronald C. Montano ("Montano"), Travis Stephenson, Antonio Giacca, and Michael Wright, alleging numerous violations of the Securities Act of 1933 and the Exchange Act of 1934.[1] Doc. No. 54. The SEC also asserts claims against Romeo A. Montano, Elma C. Montano, REM Florida Properties, LLC, and Denise Montano as Relief Defendants. *Id.* The SEC alleges the following claims against Montano:

*First Claim for Relief:* Fraud in the Offer or Sale of Securities, Violations of Section 17(a) of the Securities Act;

*Second Claim for Relief:* Fraud in Connection with the Purchase or Sale of Securities, Violations of Section 10(b) of the Exchange Act and Rule 10b-5;

*Third Claim for Relief:* Unregistered Offer or Sale of Securities, Violations of Section 5 of the Securities Act;

*Fourth Claim for Relief:* Fraud in Connection with the Purchase or Sale of Securities By or Through Means of Others, Violations of Section 20(b) of the Exchange Act;

*Fifth Claim for Relief:* Fraud in the Offer or Sale of Securities, Aiding and Abetting Violations of Section 17(a) of the Securities Act; and

*Sixth Claim for Relief:* Fraud in Connection with the Purchase or Sale of Securities, Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5. *Id.* at 39-44.

---

[1] On March 5, 2019, consent judgments were entered against Giacca and Stephenson on the original complaint. Doc. Nos. 48, 49, 50. On August 15, 2019, a consent judgment was entered against Wright. Doc. Nos. 84, 85.

On April 1, 2019, Montano filed an answer and affirmative defenses. Doc. No. 64. Montano asserts ten numbered affirmative defenses, though some are overlapping or redundant, *id.* at 15-18:

*First:* that the Complaint fails to state a claim upon which relief can be granted because not all binary options are securities, and "there needs to be a security." *Id.* at 15.

*Second:* lack of subject matter jurisdiction because the claims involved relate to brokers who do not reside in the United States, and the SEC lacks jurisdiction to regulate them. *Id.* Montano also alleges that "binary options are not necessarily securities, and thus the SEC lacks subject matter jurisdiction." *Id.*

*Third:* that the SEC does not have statutory authority to regulate the actions alleged in the Complaint because "binary options are not necessarily securities," and the harm "was caused by international actors . . . ." *Id.* at 16.

*Fourth:* that the harm was caused by third party brokers that Montano had no contact with and could not control. *Id.*

*Fifth:* repeating this allegation and adding that the harm was caused by consumers' reliance on the third-party brokers' statements. *Id.*

*Sixth:* again, stating consumers relied on third party brokers' statements, and therefore Montano's statements were not material. *Id.* at 17.

*Seventh:* that the SEC fails to allege specific statements consumers relied on that were fraudulent or false. *Id.*

*Eighth:* that the SEC's claims are barred by "res judicata due to the judgment in the case of *Federal Trade Commission v. Montano, et al.*, 6:17-cv-2203-Orl-28KRS, District Court for the

Middle District of Florida." *Id.* Montano asserts that the damages in that case overlap with the damages alleged here. *Id.*

*Ninth:* that Montano "acted in good faith as defined in 15 U.S.C. §§ 77o(a), 78t(a), and other applicable law . . . ." *Id.*

*Tenth:* that the statute of limitations bars the causes of action, as they are based "on alleged wrongdoing that took place more than five years before the original Complaint was filed . . . ." *Id.* at 18.

On November 21, 2019, Montano filed a motion for summary judgment. Doc. No. 111. On December 23, 2019, the SEC filed its response to the Montano Motion. Doc. No. 113. On January 6, 2020, Montano filed his reply to the response. Doc. No. 117. On July 24, 2020, the undersigned issued a Report and Recommendation that the Montano motion be **DENIED.**

Also on November 21, 2019, the SEC filed a motion for partial summary judgment on liability. Doc. No. 99. A response and reply duly followed. Doc. Nos. 114, 115.

## FACTS

Montano worked in affiliate marketing in binary options. Doc. No. 111-2 at 4. He was promoting "[b]inary options in general and how to make money in binary options." Doc. No. 100 at 17. Montano was regularly making over six figures "as part of the binary options niche[.]" Doc. No. 100 at 2; Doc. No. 111-2 at 2.

Affiliate marketing in binary options is advertising designed to funnel customers to brokers to open an account. Doc. No. 99-3 at ¶ 11. The campaigns advertised a trading system that could be accessed for free if the customer opened and funded a binary options account with a broker. *Id.* Affiliate marketing in binary options involved the creation of bulk dissemination of solicitation materials. *Id.* at ¶ 12. Each email contained a link for the customer to click on that would direct

4

them to a campaign website. *Id.* at ¶ 12. Montano sent out emails with links to the landing pages. Doc. No. 111-2 at 6. Montano would create a video that appeared on the website touting a trading system that would trade in binary options for the customer. Doc. No. 111-2 at 6; Doc. No. 99-6 at ¶ 38. When Montano sent follow-up emails, he sent them in the name of the fictional characters in the videos. Doc. No. 100 at 32. Montano would use the video as the landing page. Doc. No. 111-2 at 6. The landing page would send the visitors that were interested to BOA or Boost, who were broker aggregators, through their funnels, such as an opt-in box. *Id.*; Doc. No. 100 at 14-16. The minimum amount to fund an account was $250. Doc. No. 99-3 at ¶ 13. Montano would also recruit sub-affiliates to promote the offers and provide them with targeted emails to use. Doc. No. 99-3 at ¶ 20.

Montano knew that the stories portrayed in the videos were fictional and that the testimonials were portrayed by actors. Doc. No. 111-2 at 8. Montano did not know of "any real traders who actually used the services that [he] was promoting as an affiliate advertiser in connection with binary options[.]" *Id.* He also was not "aware of any trading results in connection with services, products that [he] was promoting as an affiliate advertiser in connection with binary options[.]" *Id.* Montano knew that the videos he paid others to create "were based on trading results and profits and losses that were not related to real people's trading results from a product [he was] promoting[.]" *Id.* at 9, 10. Montano states that he was promoting the brand from BOA and Boost that customers were going to get when they signed up. Doc. No. 100 at 17.

Montano was paid when customers opened and funded trading accounts, which were referred to as "first time deposits" ("FTD"). Doc. No. 111-2 at 11. Montano assumed that once customers funded the accounts, they would begin trading. *Id.* at 15. An FTD triggers a "CPA," which is a "cost per action," and is the amount of money the affiliates and advertisers would get

paid when an FTD occurred. *Id.*; Doc. No. 100 at 20-21. Once an FTD was made, BOA would submit a certain amount of the FTD, for example, $275, to ClickSure. Doc. No. 100 at 18. ClickSure would then disseminate those funds to the affiliate marketers and affiliate advertisers, based on what the affiliate publisher told ClickSure the split among them should be. *Id.* at 19. When Montano was in the affiliate advertiser role, ClickSure would pay his portion for that role into his ClickSure account. *Id.* If Montano sent emails to potential customers that resulted in FTDs, he would get an affiliate commission plus the advertiser portion. *Id.* at 30. Sub-affiliates also earned commissions on FTDs. Doc. No. 99-3 at ¶ 36.

Montano worked on campaigns named Binary Cash Code, Auto Mobile Code, Trianasoft, Centument, and Centument 2.0. Doc. No. 111-1 at ¶ 9. No representations were made "regarding specific binary options or any asset that could be represented in a binary option." *Id.* at ¶ 15.

Larry's Cash Machine was a binary project that was launched under Montano's name. Doc. No. 100 at 23, 35. Montano testified that this was the first binary project that he was affiliated with and he did not create the script or video and did not contribute money to it. Doc. No. 111-2 at 14. He testified that he briefly reviewed the video before it was attached to the landing page. Doc. No. 100 at 78. The video for Larry's Cash Machine featured a purported Harvard professor that invented software that generated $38 million in profits in the prior thirty-six months. Doc. No. 99-3 at ¶ 19. It touted software that automatically traded and generated approximately 98% profits and guaranteed turning investors into millionaires within a year. *Id.* at ¶ 19. For Larry's Cash Machine, Montano received an affiliate commission, plus the advertiser portion. Doc. No. 100 at 30. The Larry's Cash Machine "campaign resulted in approximately 3,000 customers opening and funding a binary options trading account." Doc. No. 99-3 at ¶ 25.

6

From October 2013 through December 2016, Montano's and his company's bank accounts received approximately $6.5 million in deposits related to their binary options activities. Doc. No. 99-6 at ¶ 15. Montano testified that he deleted his computer files relating to binary options in 2016. Doc. No. 100 at 4-9.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Liberty Lobby, Inc.,* 477 U.S. at 257; *see* Fed. R. Civ. P. 56(c). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). In resolving a summary judgment motion, the Court must view the record evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## PARTIAL SUMMARY JUDGMENT

The SEC has captioned its motion as one for partial summary of judgment on the issue of liability, treating the matter of liability as if it were a simple binary choice with obvious consequences. While "liability" may be a relatively simple matter in a routine breach of promissory note or fender bender case, it is decidedly not a straightforward concept in a case of this complexity. Crucially, the unadorned finding of "liability" as requested by the SEC would provide

7

no guidance for the parties or the Court in fashioning the equitable relief demanded by the SEC in its Complaint. Crafting any injunction, disgorgement or calculation of civil penalties, necessarily would be tied to detailed and specific findings as to the number and nature of violations of the laws and regulations. A generalized finding of "liability," as requested by the SEC would do nothing to assist in making those determinations.

The SEC's case here involves multiple counts, relying on varying theories of liability and levels of scienter. The case encompasses a multitude of marketing campaigns with differing types of alleged involvement by Montano. His activities and those of other participants varied from campaign to campaign. A summary finding of "liability" which could be predicated upon a single incident would be no practical value in the proceedings necessary for entry of final judgment.

In a recent decision, the Supreme Court made clear that equitable remedies, in particular disgorgement of profits (as sought here), must be closely tied to the specific conduct of a given defendant. *Liu v. SEC,* 591 U.S. ___ (June 22, 2020). The motion of the SEC in this case would not support that kind of determination, and a full trial would still be necessary to fully determine the scope of Montano's responsibility.

When a proposed partial summary judgment does not advance ultimate resolution of a case, the motion may be denied on that basis, even if it is otherwise well supported. It is "not mandatory that the court grant partial summary judgment on all such issues. . . . A court, in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation." *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975) (citing 6 J. Moore, Federal Practice P56.15(6), at 2427). *Powell* also relied on Rule 56(d), which at the time stated that entering partial summary judgment when the case cannot be fully adjudicated on the motion was qualified

by the language "if practicable." Although Rule 56 was amended, eliminating the "if practicable" phrase, courts still rely on the principle that partial summary judgment may be denied where it does not result in judicial efficiency. *See United States v. Khan*, No. 3:17-CV-965-J-PDB, 2019 WL 764026, at *17 (M.D. Fla. Feb. 21, 2019) (citing *Powell*). In *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-CV-00123-JRGRSP, 2018 WL 3375192 (E.D. Tex. July 11, 2018), the court discussed why motions for partial summary judgment may be denied in complex cases:

> Granting such motions when the rest of the case is proceeding to trial is inherently problematic. If, on appeal, it is determined that there was a genuine issue for the jury, the case would return for another trial. In some cases, partial summary judgment might require retrial of an entire case. Granting partial relief like this, when a trial is going to happen no matter what, does not promote "the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. If there really is no genuine issue for trial, it should not be difficult to convince a jury, or the court on a post-trial motion.

*Id.* at *4. *Optis Wireless*, *id.*, quoted *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948), in which the United States Supreme Court cautioned that "summary procedures, . . . present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution." The *Kennedy* court stated that good judicial administration involves withholding decisions on dispositive questions until a more solid record is developed, as the partial judgment "might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide." *Kennedy v. Silas Mason Co.*, 334 U.S. at 257. In complex cases, partial summary judgments should be "'conducive to the conservation of judicial resources and of benefits to the parties.'" *Optis Wireless*, No. 2:17-CV-00123-JRGRSP, 2018 WL 3375192, at *5 (quoting *Bruschini v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 911 F. Supp. 104, 106 (S.D.N.Y. 1995)). The "modest benefit" of trimming some time from a trial "is outweighed by the high risk of error, not to mention the

9

intrusion on the Constitutional right to a jury trial if it turns out there were genuine issues of fact."

*Id.*

Notably, determination of liability in an SEC liability action is a jury question while remedial issues are left for the Court to determine. *Tull v. United States,* 481 U.S. 412 (1987). It is unclear, however, what degree of specificity a jury's verdict should include for the Court to determine appropriate relief. This subject is discussed in a persuasive law review article:

> In particular, no court has decided whether it is sufficient for Seventh Amendment purposes for a jury to find the charged securities law violation alone, or whether the jury must also make the particular factual findings set forth in the penalty provisions of the federal securities laws that expose a defendant to a particular penalty tier. This question is of significant practical importance: just because a jury finds that the SEC has proved each element of the alleged securities law violation, it does not follow that the jury has made all factual findings that are required to impose a particular statutory penalty. What must be shown under the federal securities laws' penalty provisions to trigger a given penalty may be more than what must be shown to establish a violation in the first instance. This is especially so with regard to strict liability and negligence-based securities law violations.
> 
> The issue considered here is the scope of a defendant's Seventh Amendment right to a jury finding of "liability" before a particular monetary penalty may be imposed in an SEC enforcement action. This analysis is done in light of the Supreme Court's more recent jurisprudence holding that a criminal defendant's Sixth Amendment right to a jury trial extends to all facts that increase the statutory maximum sentence that a judge may impose. This Article concludes that, following the Supreme Court's decision in *Tull*, the Seventh Amendment similarly entitles a defendant in an SEC enforcement action brought in federal district court to a jury finding as to all facts that set the statutory maximum civil money penalty that a district judge may impose. It should make no difference whether the facts on which the maximum penalty turns are located in the statutory provision defining the violation itself or are instead located elsewhere in the statutory scheme and characterized as penalty enhancers.
> 
> In other words, the question of liability on which *Tull* holds a defendant is entitled to a jury trial extends beyond the elements of the violation proper to include all factual findings that can lead to a more severe maximum sanction. It is not enough for the jury simply to find that there was a securities law violation if an enhanced civil money penalty is to be imposed. One's liability for purposes of the Seventh Amendment jury trial right cannot be assessed apart from the maximum sanction to which one is ultimately exposed.

Martin and Parades, *The Scope of the Jury Trial Right in SEC Enforcement Actions,* 71 N.Y.U.

Ann. Surv. Am. L. 147, 148-49 (2015).

Applying this understanding to the case at hand, it is manifest that a partial summary judgment of "liability" serves no purpose. A jury would still need to determine the number of violations, their seriousness, amount of gain, reliance and causation. Moreover, even if the positions advanced in the law review article are not accepted, the Court itself would still need a trial fully exploring the details of Montano's activities in order to determine the same issues and have a basis for assessing equitable relief.

Because the finding requested in this motion would not be of assistance to the administration justice in bringing the case to conclusion, **it is recommended that the motion be DENIED.**

## MERITS

It is appropriate, somewhat in passing, to consider the merits of the motion. Although Rule 56 applies in all civil cases, it has long been recognized that summary treatment is rarely suitable in complex cases, particularly those involving complicated legislation and regulations. *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2732 *et seq.* (4th ed. Apr. 2020). This principle applies with even greater force when summary judgment is sought by the party bearing the burden of proof and persuasion.

The SEC has amassed a substantial record that *could* support inferences for the findings and conclusions necessary for the judgment it seeks. However, on its motion for partial summary judgement, those inferences must be viewed most favorably to Montano. A jury may simply decline to draw all the conclusions the SEC wishes from its evidence. In particular, statements from Montano's fellow participants that tend to incriminate him may be discounted or disbelieved. Even with respect to possible adverse inferences that may arise from Montano's refusal to answer

questions and provide discovery, those inferences are only permissive and do not result in an automatic summary judgment.

Montano has admitted a great deal, and he concedes that many of the facts are uncontested. Nonetheless, this is a case involving numerous complex transactions with multiple participants, uncertain states of mind, issues of causation, damages and scope of equitable relief. In such cases, inferences are controlling and best left for the finders of fact. *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 256–57 (1948) ("[S]ummary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice." (footnote omitted)); *Bradbury v. Wainwright,* 718 F.2d 1538, 1546 (11th Cir. 1983) (complexity, new applications of legal principles, and potential impact are relevant considerations in using summary procedures with caution).

This is not the rare case where a plaintiff with the burden of proof and persuasion can prevail at summary judgment. By its own account of events, the SEC concedes that this case involves a myriad of marketing campaigns as to which Montano's role varied and as to which he had varying other participants, acting in numerous capacities. The details of the methods, objectives, and revenue sharing of these numerous campaigns, as described in the hundreds of pages of the record submitted by the SEC, while having a number of elements in common, sufficiently differ so as to prevent the broad brush approach urged by the SEC. The record developed and presented by the SEC identifies and cites to numerous actions and statements by Montano that tend to show misrepresentations and fraudulent omissions. That evidence, however, is at least in part, subject to other inferences as to Montano's culpability (especially vis-à-vis others), whether every campaign operated in violation of legal requirements, and the extent to

which Montano profited from the operation. A summary and undifferentiated finding of liability is not warranted in such circumstances.

For these reasons as well, the motion for partial summary judgment should be **DENIED**.

## NOTICE TO PARTIES

**A party's failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its filing waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.**

Recommended in Orlando, Florida, on July 31, 2020.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record